619 F.2d 1368
 14 ERC 1181, 14 ERC 1444, 10 Envtl.
L. Rep. 20,252
 ENVIRONMENTAL DEFENSE FUND, INC.; Colorado Open Space
Council, Inc.; and Friends of the Earth, Inc.,
Plaintiffs-Appellants,
v.
Cecil D. ANDRUS, as Secretary of the United States
Department of the Interior; Peter A. Rutledge, as Area Oil
Shale Supervisor, United States Geological Survey; Dale R.
Andrus, as Director, Colorado State Office, United States
Bureau of Land Management; Gulf Oil Corporation; Standard
Oil Company (Indiana); Ashland Oil Inc.; and Occidental Oil
Shale, Inc., Defendants-Appellees.
 No. 78-1809.
 United States Court of Appeals,
Tenth Circuit.
 Argued Nov. 29, 1979.
Decided March 3, 1980.
Rehearing Denied May 6, 1980.
 
 Paula C. Phillips, Denver, Colo. (David Mastbaum and Craig S. Barnes, Denver, Colo., with her on the brief), for plaintiffs-appellants.
 Martin Green, Atty., Dept. of Justice, Washington, D. C. (James W. Moorman, Asst. Atty. Gen., Robert L. Klarquist, Atty., Dept. of Justice, Washington, D. C., and Joseph F. Dolan, U. S. Atty., Jerry B. Tompkins, Asst. U. S. Atty., Denver, Colo., with him on the brief), for defendants-appellees.
 Thomas H. Truitt of Wald, Harkrader & Ross, Washington, D. C. (Thomas C. Matthews, William R. Weissman and Carol Kinsbourne of Wald, Harkrader & Ross, Washington, D. C., Robert H. Harry of Davis, Graham & Stubbs, Denver, Colo., Lawrence J. LaBrie, Ashland, Ky., and Daniel R. Hale, Bakersfield, Cal., of counsel, with him on the brief), for defendants-appellees Ashland Colorado, Inc. and Occidental Oil Shale, Inc.
 Christopher Lane of Dawson, Nagel, Sherman & Howard, Denver, Colo. (Don H. Sherwood of Dawson, Nagel, Sherman & Howard, Kent R. Olson, David E. Brody and Rebecca McGee, Denver, Colo., with him on the brief), for defendants-appellees Gulf Oil Corporation and Standard Oil Company (Indiana).
 Before HOLLOWAY, BARRETT and DOYLE, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 The Court has learned of the tragic and untimely death shortly before oral argument of this case of one of the lead counsel for appellee, C-b lessees, Thomas C. Matthews, Jr., a distinguished member of the bar of the District of Columbia. Mr. Matthews' last professional undertaking was the preparation of C-b's brief in this case.
 
 
 2
 This appeal is taken by Environmental Defense Fund, Inc., Colorado Open Space Council, Inc., and Friends of the Earth, Inc., hereinafter jointly referred to as Appellants or Environmental Defense, from the District Court's grant of Summary Judgment, following filing of cross motions therefor, to Cecil D. Andrus, Secretary of the United States Department of the Interior, Peter A. Rutledge, Area Oil Shale Supervisor, United States Geological Survey, Dale D. Andrus, Director, Colorado State Office, United States Bureau of Land Management, Gulf Oil Corporation, Standard Oil Company of Indiana, Ashland Colorado, Inc. and Occidental Oil Shale, Inc., hereinafter collectively referred to as Appellees or Secretary. No contention is raised that the case was not ripe for summary judgment. Jurisdiction of this Court vests pursuant to 28 U.S.C. § 1291.
 
 
 3
 The District Court did not enter formal, written findings and conclusions. The Court did, however, render a detailed oral bench ruling properly identifying the primary concern as ". . . the sufficiency of an environmental impact statement prepared in connection with the prototype oil shale leasing program, a program which has a goal of developing commercial oil shale technology by private industry through the leasing of certain designated tracts of Federally-owned land". (Joint Appendix, pp. 452, 453).
 
 
 4
 On appeal, Environmental Defense presents three basic issues: (1) whether the District Court, in addressing the issues presented by the summary judgment motions, erred (1) in failing to apply the proper standard of review required by this Circuit and (ii) in according overriding deference to the conclusory allegations of the federal defendants where those allegations are refuted by the undisputed facts in the record; (2) whether the District Court erred in holding that the federal defendants complied with the National Environmental Policy Act on the basis of (i) a programmatic environmental impact statement that was patently deficient in its analyses of the subsequent, site-specific actions at issue, and (ii) assorted other documents none of which could meet, individually or collectively, the Act's mandatory requirements, and (3) whether the federal defendants' clear and continuing violations of the National Environmental Policy Act require the issuance of an injunction pending preparation of the required environmental impact statements.
 
 
 5
 Some general background is helpful in placing the contentions before us in proper perspective. The issues before the District Court were presented under Sec. 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2)(C), 1970, and implementing regulations and guidelines. The complaint, filed December 6, 1977, sought an order: compelling defendants to comply with NEPA, the implementing regulations and guidelines; to enjoin and restrain the federal defendants from approving detailed development plans (DDPs) prepared and submitted by defendant lessees in lieu of an environmental impact statement (EIS) which Environmental Defense contends must be prepared and circulated by Secretary; to enjoin granting certain rights-of-way by Secretary to Tracts C-a and C-b (covering tracts of land situate entirely in Colorado) until the required EIS is completed and evaluated; and restraining any further activities on the subject leases by defendant lessees until the EIS is prepared, evaluated and approved.
 
 
 6
 Oil shale deposits in the western United States came into critical focus some nine years ago when domestic reserves of oil and gas substantially diminished. This necessitated a quest for other sources of domestic oil which could be produced and marketed in a commercially feasible setting. This quest involved a policy determination that private firms should be encouraged to lend their capital and expertise in the development of commercial oil shale technology. As a result, the United States Government undertook a Prototype Oil Shale Leasing Program in 1969, designed to further the development of publicly owned oil and shale resources, providing environmental concerns could be satisfactorily recognized, considered and resolved.[1]
 
 
 7
 During 1971, the Department of Interior formulated an oil shale leasing program encompassing seven steps: (1) promulgation of an EIS, (2) approval of an overall prototype program based on the environmental description and analysis of the EIS, (3) solicitation of competitive bids and awarding of leases for the tracts reviewed in the EIS, (4) filing by the lessees of Detailed Development Plans ("DDPs"), supplements and modifications thereto, if needed, (5) review and approval of the DDPs by the Area Oil Shale Supervisor ("AOSS"), (6) specific site authorizations, such as rights-of-way, and (7) development of deposits on leased tracts in compliance with the terms of the lease and the DDP.
 
 
 8
 Prior to undertaking these steps, the Secretary prepared a draft environmental impact statement in September, 1972, in three volumes. It described various processes used to extract and reduce oil from the oil shale along with the environmental impacts which might result from those actions. The draft EIS was subject to exhaustive review, including panel studies on the environmental impact of underground mining, surface mining, and/or in situ operations.
 
 
 9
 The first and most painstaking, comprehensive of the seven steps, that of preparation of the EIS, was pursued by the Secretary with meticulous care following preparation and circulation of the three volume "Draft Environmental Statement for the Proposed Prototype Oil Shale Leasing Program". Numerous public hearings, invitations for comments and input preceded publication by the Secretary of this six (6) volume "Final Environmental Impact Statement for the Prototype Oil Shale Leasing Program" on August 30, 1973. Recognizing that § 102(2)(C), (42 U.S.C. § 4332(2)(C)) is at the heart of NEPA, the Secretary undertook a comprehensive study of the environmental effects of the proposed project and various alternatives which included a point-by-point analysis of the public comments submitted at the various public hearings held on the draft EIS. The first three volumes of the final EIS consist of 1,669 pages; the fourth volume, 265 pages containing analysis of public comments on the draft environmental impact statements; and the fifth and sixth volumes, respectively, contain 202 letters received relating to the draft EIS and a transcript of the hearings held on the draft EIS. The final EIS considered in detail the possible environmental consequences anticipated from the development of the six specific tracts of land to be leased, two each in Colorado, Utah and Wyoming. The EIS also considered the differing environmental impacts which might result from either surface or underground mining of oil shale, as well as from either surface or underground a/k/a in situ retorting of oil shale. In addition, the EIS considered the environmental effects of roads and power lines, which would have to be constructed in order to develop oil shale, on these particular tracts.
 
 
 10
 The final EIS carefully noted that various individuals and organizations urged that the approval of the lessees' DDPs be preceded by the preparation of a subsequent (or new) EIS. This suggestion was rejected by the Secretary in favor of the procedure originally proposed in the draft EIS.
 
 
 11
 On November 28, 1973, the Secretary approved the Prototype Oil Shale Leasing Program. Thereafter, the Secretary pursued the detailed procedure leading to the issuance of the subject leases based upon substantial bonus bid payments.[2] Each of the leases contains, in Section 10, a requirement that the lessee prepare and submit detailed development plans (DDPs) to the AOSS within three (3) years following the issuance of the lease:
 
 
 12
 Section 10. Development plan and diligence requirements
 
 
 13
 (a) The Lessee shall file with the Mining Supervisor on or before the third Anniversary Date a detailed development plan. This plan shall include: (1) a schedule of the planning, exploratory, development, production, processing, and reclamation operations and all other activities to be conducted under this lease; (2) a detailed description pursuant to 30 CFR Part 231 and 43 CFR Part 23 of the procedures to be followed to assure that the development plan, and lease operations thereunder, will meet and conform to the environmental criteria and controls incorporated in the lease; and (3) a requirement that the Lessee use all due diligence in the orderly development of the Lease Deposits, and, in particular, to attain, at as early a time as is consistent with compliance with all the provisions of this lease, production at a rate at least equal to the rate on which minimum royalty is computed under section 7(e)(1).
 
 
 14
 Prior to commencing any of the operations under the development plan in the Leased Lands, the Lessee shall obtain the Mining Supervisor's approval of the development plan. The Mining Supervisor shall not delay unnecessarily in the consideration of a development plan, but he shall take time to consider both technical and environmental provisions of the plan thoroughly prior to approval, and shall hold public hearings on the environmental provisions to assist him in his consideration of the detailed development plan. If the development plan submitted by the Lessee is unacceptable, the Mining Supervisor shall inform the Lessee by written notice of the reasons why the development plan is unacceptable and shall give him an opportunity to amend the plan. If an acceptable development plan is not submitted to the Mining Supervisor by the Lessee within one year after the Lessee's receipt of that notice, the Mining Supervisor shall send a second written notice to the Lessee concerning the unacceptability of the development plan. A failure by the Lessee to submit an acceptable plan within one year after his receipt of the second written notice, without reasonable justification for delay, shall be grounds for termination of the lease, if the Lessor so elects.
 
 
 15
 Upon approval of the plan, the Lessee shall proceed to develop the Leased Deposits in accordance with the approved plan. After the date of approval of the development plan, the Lessee shall conduct no activities upon the Leased Lands except pursuant to that development plan, or except for necessary activities following a relinquishment under section 28 of this lease or for the disposition of property after termination pursuant to section 32 of this lease.
 
 
 16
 (b) The Lessee must obtain the written approval of the Mining Supervisor of any change in the plan approved under subsection (a).
 
 
 17
 (c) The Lessee shall file with the Mining Supervisor annual progress reports describing the operations conducted under the development plan required under subsection (a).
 
 
 18
 (d) Prior to undertaking any exploratory work on the Leased Lands between the Effective Date and the date of approval of the detailed development plan required by subsection (a) of this section, the Lessee shall file with the Mining Supervisor a plan showing the exploratory work which he proposes to undertake and he shall not commence that work until the Mining Supervisor has approved the plan. Exploratory work, as used in this subsection, shall include, but not be limited to, seismic work, drilling, blasting, research operations, cross-country travel, the construction of roads and trails and other necessary facilities, and the accumulation of baseline data required under section 1(C) of the Oil Shale Lease Environmental Stipulations. Prior to approval of the detailed development plan under subsection (a) of this section, all exploratory work on the Leased Lands shall be conducted pursuant to a plan approved under this subsection.
 
 
 19
 (Joint Appendix, pp. 174-177).
 
 
 20
 In addition to the environmental concerns expressed in Section 10, supra, the lease contains covenants that: Lessee conduct all operations under the lease in accordance with all applicable Federal, State and local ". . . water pollution control, water quality, air pollution control, air quality, noise control, and land reclamation statutes, regulations, and standards" (Sec. 11(a)); "(w)here in situ methods are used for development of Oil Shale, the Lessee shall not place any entry, well, or opening for such operations within 500 feet of the boundary line of the Leased Lands without the permission of, or unless directed by, the Mining Supervisor, nor shall induced fracturing extend to less than 100 feet from that boundary line." (Sec. 13); lessees shall conduct environmental baseline monitoring programs prior to operations and continue to monitor environmental conditions during and subsequent to operations (Stip. Sec. 1C(1)). The leases contain many other, detailed environmental stipulations and provide that failure of performance by lessees constitutes a breach of the lease. Thus, the leases provide comprehensive environmental protection measures to be pursued by the lessees with the prior approval of the Secretary. These terms are quite significant and compelling in relation to compliance with the mandates of NEPA.
 
 
 21
 Inasmuch as the projected oil shale program constituted an experimental development undertaking, when the Secretary prepared the final EIS in 1973 for the Prototype Oil Shale Leasing Program, the EIS related that it was programmatic, regional, and site and project specific, encompassing an analysis of developmental plans and right-of-way approvals. The EIS addressed the environmental effects of the entire prototype program. It was intended to encompass the full range of all possible environmental consequences involving mining plans and the issuance of special land use permits. With this objective targeted, Secretary, in an effort to aid in the administration of the project, created both the office of Area Oil Shale Supervisor (AOSS) and an Oil Shale Environmental Advisory Panel (OSEAP) consisting of individuals from both the private and public sectors.
 
 
 22
 In 1974, after the two leases here involved were awarded, each lessee proceeded to conduct a two year baseline study, collecting data in a site-specific manner. Upon completion thereof, a "Final Environmental Baseline Report" was published in October of 1976. In addition, detailed development plans (DDPs) were prepared by the lessees for each leased tract, in early 1976. The C-b lessees proposed to extract the oil shale by underground mining operations, and surface retorting. The C-a lessees proposed the extraction of the shale through an open pit mine, the shale to be retorted, and processed shale disposed of in some area removed from the leased tract.
 
 
 23
 Both lessees submitted modifications to their DDPs in 1977. The C-b lessees determined to undertake underground or "in situ " retorting of the oil shale, rather than the previously proposed surface retorting. The C-a lessees proposed some "in situ " retorting in conjunction with some surface retorting. The determination that no supplemental EIS was required was thereafter made by the Secretary predicated upon the Final EIS coupled with the material submitted and the detailed development plans (DDPs) relative to each lease.
 
 
 24
 The DDPs, as modified, were given exhaustive study and review by the AOSS, and subject to public review and comment before AOSS approval. The AOSS was created in 1974 by the Secretary through the United States Geological Survey. This office sometimes referred to simply as Area Supervisor consisted of a well staffed team of some sixteen qualified professionals representing a broad range of expertise who were involved in the day-to-day administration of the Prototype Program. In addition to the AOSS, the Secretary created OSEAP, consisting of representatives of interested federal agencies, including EPA, state governments and private citizens and groups active in environmental matters. The record reflects that in the three years prior to the 1977 DDP modifications OSEAP had conducted some 24 public meetings, each of which were attended by the Area Supervisor or his deputy. Thus, the procedure established quite obviously constituted a disciplined, careful method for detailed comparison of the DDPs, as modified, with the EIS leading to the Secretary's final determination that the environmental impacts of the DDPs, as modified, had been identified and described in the EIS. The AOSS described the modified "in situ " techniques as representing a combination of conventional underground mining techniques and "in situ " recovery techniques, which had been discussed in volume I of the 1973 EIS. While recognizing that the modified technique constituted an improvement over earlier retort methodology and thus in this sense differing in some ways from the methodology identified in 1973 the AOSS determined that the environmental impacts associated with the modified technique did not differ in any significant degree from the impacts identified in the 1973 EIS. (Joint Appendix, 387-388; 377-378). The Secretary agreed and this finding was affirmed by the District Court.
 
 
 25
 The instant suit was filed by Environmental Defense on December 6, 1977, seeking to compel Secretary to comply with NEPA; Executive Order 11514, 35 Fed.Reg. 4247 (1970), as amended by Executive Order 11991, 42 Fed.Reg. 26967 (1977); the Guidelines of the President's Council on Environmental Quality, 40 C.F.R. Part 1500; and the Secretary's regulations and guidelines implementing NEPA in the Secretary's administration of the prototype oil shale leasing program.
 
 
 26
 The Mandates of NEPA Generally and as Applied Here.
 
 
 27
 This Court has consistently emphasized that the requirements of NEPA (42 U.S.C. § 4332) are mandatory in nature and that these mandates apply to procedure and do not undertake to control decision making within the departments. Jette v. Bergland, 579 F.2d 59 (10th Cir. 1978); Wyoming Outdoor Coordinating Council v. Butz, 484 F.2d 1244 (10th Cir. 1973); National Helium Corporation v. Morton, 455 F.2d 650 (10th Cir. 1971). These requirements (42 U.S.C. § 4332) are that all federal government agencies shall:
 
 
 28
 (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on
 
 
 29
 (i) the environmental impact of the proposed action,
 
 
 30
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 
 
 31
 (iii) alternatives to the proposed action,
 
 
 32
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 
 
 33
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 
 
 34
 Thus, at the heart of NEPA is § 102(2)(C) and its mandate that, under specified circumstances, federal agencies must prepare an Environmental Impact Statement. Accordingly, it is through the preparation of the statement that the objective and thorough evaluation of the environmental impact of the proposed project is to be accomplished. The thrust of NEPA is that all pertinent environmental data be gathered in one place, i. e., the "statement", there constituting a discussion of all relative environmental impacts of a proposed course or alternative courses of action which reflects that the agency has given all pertinent environmental matters a "hard look" and has made a "good faith, objective, and reasonable presentation of the subject areas mandated by NEPA . . ." Manygoats v. Kleppe, 558 F.2d 556, 560 (10th Cir. 1977). The discussion of environmental effects of all alternatives need not be exhaustive, but it must be such that sufficient information is contained therein to permit a "rule of reason" designation of alternatives beyond the primary proposal. In the last analysis, the test the agencies must meet in dealing with the environmental aspects of proposed action is anchored to the "rule of reason" which, broadly stated in Manygoats, supra, may be said to be this: If the environmental aspects of proposed actions are easily identifiable, they should be related in such detail that the consequences of the action are apparent. If, however, the effects cannot be readily ascertained and if the alternatives are deemed remote and only speculative possibilities, detailed discussion of environmental effects is not contemplated under NEPA. This is in keeping with the "rule of reason" employed in Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (D.C.Cir.1972):
 
 
 35
 We reiterate that the discussion of environmental effects of alternatives need not be exhaustive. What is required is information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned.
 
 
 36
 Furthermore, the requirement in NEPA of discussion as to reasonable alternatives does not require "crystal ball" inquiry . . . The statute must be construed in the light of reason if it is not to demand what is, fairly speaking, not meaningfully possible, given the obvious . . .
 
 
 37
 In the last analysis, the requirement as to alternatives is subject to a construction of reasonableness, and we say this with full awareness that this approach necessarily has both strengths and weaknesses. Where the environmental aspects of alternatives are readily identifiable by the agency, it is reasonable to state them for ready reference by those concerned with the consequences of the decision and its alternatives.
 
 
 38
 148 U.S.App.D.C. at pp. 14-15, 458 F.2d at pp. 836-837.
 
 
 39
 In the case at bar, the EIS: analyzed different oil shale technologies and environmental controls, assessing the regional environmental impacts of development from the Prototype Oil Shale Leasing Program in contemplation of production of 50,000 barrels per day from the six tracts in the three States to and including the possible production of a million barrels per day; analyzed the adverse environmental impacts which cannot be avoided resulting from the development and production including the irreversible commitments of resources; discussed the energy alternatives to oil shale development, the energy situation, the projected energy requirements of the United States, and the possibilities of substituting other forms of energy for shale oil; analyzed the mining and processing options which might be used as well as the environmental impacts of those options and their adverse effects and mitigating measures; and, detailed the years of study, coordination with other federal agencies, state and local government and the public. The EIS specifically spoke to the environmental impacts of the entire Prototype Program, including the approval of lessees' DDPs and the granting of access road widening right-of-way permits the two matters challenged by Environmental Defense. The EIS carefully addressed the impact of various alternative DDP proposals as well as access road permit applications.
 
 
 40
 There is no dispute here that Environmental Defense did not heretofore and does not now challenge the adequacy of the EIS prepared by the Secretary in 1973, which was consciously designed to be programmatic, site-specific, and project-specific.
 
 
 41
 NEPA does not require that every implementing action be set forth in the EIS in absolute detail. If such be required, it seems obvious that a prototype program such as that involved in the instant case would be hopelessly ensnarled and stymied. Such is not intended. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).
 
 
 42
 Our Standard of Review.
 
 
 43
 In National Helium Corporation v. Morton, supra, we emphasized that the mandates of the NEPA pertain to procedure and do not undertake to control decision making within the departments. We there also stated:
 
 
 44
 As we view it then the purposes of the NEPA are realized by requiring the agencies to assess environmental consequences in formulating policies, and by insuring that the governmental agencies shall pay heed to environmental considerations by compelling them to follow out NEPA procedures.
 
 
 45
 455 F.2d at p. 656.
 
 
 46
 In Save Our Invaluable Land (Soil), Inc. v. Needham, 542 F.2d 539 (10th Cir. 1976), cert. denied, 430 U.S. 945, 97 S.Ct. 1580, 51 L.Ed.2d 792 (1977), we said:
 
 
 47
 Judicial review of an EIS is limited to a consideration of the following: (1) does the EIS discuss all of the five procedural requirements listed in 42 U.S.C. § 4332(C); (2) does the EIS constitute a good faith compliance with the demands of NEPA; and (3) does the statement contain a reasonable discussion of the subject matter involved in the five respective areas? Sierra Club v. Stamm, 507 F.2d 788 (10th Cir. 1974) and National Helium Corporation v. Morton, 486 F.2d 995 (10th Cir. 1973), cert. denied, 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 . . . (1973). Thus, in a real sense, an EIS is to be tested by the concepts of "good faith" and a "reasonable" discussion of the five mandated areas of subject matter. Perfection is not the test . . . Nor should the courts in evaluating an EIS engage in hindsight judgment by way of second guessing. (Emphasis supplied).
 
 
 48
 542 F.2d at pp. 542, 543.
 
 
 49
 See also: Manygoats v. Kleppe, supra; Sierra Club v. Stamm, supra.
 
 
 50
 In Manygoats, supra, this Court was concerned with an action seeking to restrain the performance of an agreement whereby the Navajo Tribe granted to Exxon Corporation the right to explore for, and mine, uranium on Tribal lands. The Secretary of the Interior approved the agreements following the preparation of an EIS pertaining to an agreement by the Bureau of Indian Affairs, which the Secretary also approved. The challenge was, of course, to the sufficiency of the EIS. In affirming the District Court, we held that the EIS was a comprehensive, good faith, objective and reasonable presentation of the subject areas mandated by NEPA. Having noted the ongoing objective of the agreement involving exploration, mining and milling, this Court looked with favor on the adequacy of the EIS which, just as in the case at bar, provided that no operations could be conducted except under "a detailed plan of operation" to be approved by the Secretary. In addition, it was there provided that operations were to be suspended if, in the opinion of the Secretary, they threatened "immediate, serious or irreparable damage to the environment". We there stated:An EIS is required only in the event of proposed federal action and must be tailored to that action. See Kleppe v. Sierra Club, 427 U.S. 390, 96 S.Ct. 2718, 2726-2727, 49 L.Ed.2d 576 . . . The kind of impact statement depends on the kind of federal action. Aberdeen & Rockfish R. Co. v. SCRAP, 422 U.S. 289, 322, 95 S.Ct. 2336, 45 L.Ed.2d 191 . . . In the instant case the federal action is the approval of the Navajo-Exxon agreement relating to the prospecting permit and lease. We are concerned first with discovery and second with production of uranium . . . The agreement spells out continuing federal control over exploration and detailed federal controls over mining and milling with specific directions pertaining to environmental consequences.
 
 
 51
 The EIS is a comprehensive, good faith, objective, and reasonable presentation of the subject areas mandated by NEPA . . . It adequately informs the Secretary of the project's potential effect on the human environment. The Navajo-Exxon agreement requires continuing federal control . . . (Emphasis supplied).
 
 
 52
 558 F.2d at pp. 560-561.
 
 
 53
 Many courts have held, in accord with Manygoats, supra, that if an EIS prepared for a whole program contains a reasonable, good faith discussion of each of the five NEPA requirements applicable to future actions contemplated in order to implement the program, that no separate or supplemental EIS will be required for each future component action, unless a significant change occurs in the interval. Save Our Sycamore v. Metropolitan Atlanta Rapid Transit Authority, 576 F.2d 573 (5th Cir. 1978) (per curiam); Sierra Club v. Morton, 510 F.2d 813 (5th Cir. 1975); East 63rd Street Association v. Coleman, 414 F.Supp. 1318 (S.D.N.Y.), aff'd, 538 F.2d 309 (2d Cir. 1976); Natural Resources Defense Council, Inc. v. TVA, 367 F.Supp. 122, supplemented, 367 F.Supp. 128 (E.D.Tenn.1973), aff'd, 502 F.2d 852 (6th Cir. 1974); Minnesota Public Interest Research Group v. Butz, 498 F.2d 1314 (8th Cir. 1974) (en banc) subsequent decision, 541 F.2d 1292 (8th Cir. 1976) (en banc), cert. denied, 430 U.S. 922, 97 S.Ct. 935, 50 L.Ed.2d 340 (1977).
 
 
 54
 In Kleppe v. Sierra Club, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), the Supreme Court reversed an opinion which held that NEPA required the Secretary of the Interior to prepare an EIS on the entire Northern Great Plains region before allowing further development of federal coal reserves. The Secretary there, just as here, was responsible for issuing leases, approving mining plans, granting rights-of-way, and taking other necessary action. The Secretary undertook the same degree of preliminary investigation assessments in providing an analytical and informational framework for policy and planning decisions by formulating certain "scenarios" showing the probable consequences for the area's environment and culture from the various possible techniques and levels of resource development. The Supreme Court impliedly approved the procedure employed by the Secretary in the case at bar and in footnote 21 pertinently observed:
 
 
 55
 Neither the statute nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions. See Scenic Hudson Preservation Conference v. FPC, 453 F.2d 463, 481 (CA2 1971), cert. denied, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972). The only role for a court is to insure that the agency has taken a "hard look" at environmental consequences; it cannot "interject itself within the area of discretion of the executive as to the choice of the action to be taken." Natural Resources Defense Council v. Morton, 148 U.S.App.D.C. 5, 16, 458 F.2d 827, 838 (1972).
 
 
 56
 427 U.S. at p. 410 n. 21, 96 S.Ct. at p. 2730 n. 21.
 
 
 57
 And the Supreme Court there recognized that the Secretary's determination that where action is proposed ". . . involving coal development such as issuing several coal leases or approving mining plans in the same region, such actions will be covered by a single EIS rather than by multiple statements " (Kleppe v. Sierra Club, supra, at pp. 410-411, 96 S.Ct. at pp. 2730-2731) was not an abuse of discretion or arbitrary decision-making violative of NEPA.
 
 
 58
 The essential requirement of NEPA, then, is that before an agency takes major action it must have taken a "hard look" at the environmental consequences. Kleppe v. Sierra Club, supra. An EIS is not supposed to resolve all contentions but rather to identify them in a full disclosure sense in order to enable the decision makers to undertake informed choices. Save Our Invaluable Land (Soil), Inc. v. Needham, supra.
 
 
 59
 Were the Environmental Impacts Associated With the Modified
 
 
 60
 DDPs (1977) and Grant of the Applications For Rights-of-Way
 
 
 61
 Adequately Identified and Demonstrated In the 1973 EIS, Thus
 
 
 62
 Eliminating the Need for a Supplemental or New EIS?
 
 
 63
 In the course of oral arguments, counsel for Environmental Defense acknowledged that the 1973 EIS did not confine the exploration, development activities on the subject leases under the Prototype Program to a fixed, special method and that changes in technology may indicate or dictate alterations in methodology. Even so, Environmental Defense forcefully argues that the applicable statutes, regulations and case law distinguish between EISs on overall plans (as it identifies the 1973 EIS) and individual action (site specific) taken pursuant to those plans. In summary, Environmental Defense contends that the District Court erred in granting Secretary's motion for Summary Judgment in that: ". . . when a programmatic EIS is cited as justification for failure to prepare an EIS on an individual project within NEPA's scope, the adequacy of the programmatic statement must be tested as applied to the actions challenged, not as applied to the program as a whole. Id. (Natural Resource Defense Council, Inc. v. Administrator, Energy Research and Development Administration, 451 F.Supp. 1245 (D.C.1978)) at 1259-60; NRDC v. Morton, 388 F.Supp. at 835 ('(P)laintiffs do not quarrel with the content of the programmatic EIS, . . . (but) instead contend that . . . even if an excellent programmatic EIS (it) is insufficient standing alone.') Thus, all of defendants' make-weight arguments extolling the programmatic coverage of the 1973 EIS are simply irrelevant. The issue is whether the site-specific EIS analyses of these projects, which all parties concede are required, have in fact been done. And, as plaintiffs conclusively demonstrated, the required analyses are simply not to be found in defendants' massive programmatic EIS. Pls'. Br. at 30-44." (Reply Brief of Appellants, p. 14).
 
 
 64
 The District Court rejected the above contentions advanced by Environmental Defense. The Court, having observed that NEPA requirements are procedural and not substantive in nature, stated that the courts, on review, must take a "hard look" at the environmental consequences under the standards established in Vermont Yankee Nuclear Power Corporation v. Natural Resources Defense Council, supra; Kleppe v. Sierra Club, supra; Save Our Invaluable Land (Soil), supra; Sierra Club v. Stamm, supra; and National Helium Corporation v. Morton, supra. From thence, the District Court addressed the issues presented by Environmental Defense and found and concluded in part as follows:
 
 
 65
 We have set forth Plaintiffs' position as to what the issues are, and we consider that there is one pivotal issue in the case, and that issue is whether the decisions made in 1977 and '78 by the Area Oil Shale Supervisor and by the BLM had been made with the requisite "hard look" at the environmental consequences of their actions . . .
 
 
 66
 The Area Oil Shale Supervisor at (and) the BLM determined that the DDPs and rights-of-way could be approved without the preparation of a supplemental EIS . . . Those decisions are the only ones which we feel are now before the Court.
 
 
 67
 We find the affidavit of the Area Oil Shale Supervisor, Mr. Peter Rutledge, quite significant. He signed approval letters for the C-a and C-b and their revised and supplemented DDPs on September 22nd, 1977, and August 30th, 1977.
 
 
 68
 The Area Oil Shale Supervisor performs all functions of the mining supervisor under respective leases. And in Section 10 of the respective leases, provides for the submission by the lessees of Detailed Development Plans to the mining supervisor.
 
 
 69
 And he is to take time to consider both technical and environmental provisions in the plan thoroughly prior to approval. Set forth in Paragraph 10 of the lease.
 
 
 70
 And lease provisions were included in EIS, Volume III, so as envisioned of the area of responsibility and duty of the supervisor.
 
 
 71
 And it is admitted that no formal supplemental EIS was prepared in connection with the DDPs, nor do we find one necessary.
 
 
 72
 The Area Oil Shale Supervisor first found that the DDPs for both C-a and C-b met the terms and conditions of the leases.
 
 
 73
 This is found in Oil Shale Tract C-a Decision Document on the Detailed Development Plans, September 9, 1977, Page 125, and dealing with tract C-b, document dated August 8, 1977, at Page 162.
 
 
 74
 Mr. Rutledge then concluded that no supplemental EIS was required. He based the decision on his judgment that: A, no significant environmental impact can be expected to result from implementation of the lessees' DDPs that were not identified and described in the EIS.
 
 
 75
 B, the degree of impacts to be expected from implementation of the lessees' plans would be consistent with the degree of impact that EIS predicted might result from oil shale development on the prototype Federal oil shale tracts.
 
 
 76
 C, the types of operations proposed by the DDPs, including the elements of the mining and retorting techniques that the lessees planned to employ, were identified and described in the EIS, and, D, no new information has been reported in the scientific literature or elsewhere that led us to conclude that the presentation of impacts in 1973 EIS was materially incomplete or inaccurate in any respect.
 
 
 77
 The inner quotes are found in the Rutledge affidavit, Paragraph 105. See also C-a Decision Document at Page 36-38, and C-b Decision Document at ii and iii.
 
 
 78
 In reaching his decision, the Area Oil Shale Supervisor prepared separate working documents for each tract entitled "Relationship of Detailed Development Plans to the Prototype Program EIS."
 
 
 79
 The comparison documents for C-a, dated September 9th, '77, and C-b, August 5th, 1977, expressly addresses the need for a supplemental EIS.
 
 
 80
 Those documents made a point-by-point comparison of some eleven environmental factors, and these factors significantly considered the leaching of retorts, the corridors, air quality, resource recovery, socio-economics, fauna, flora, subsidence, land impacts, water management and reclamation.
 
 
 81
 And the Area Supervisor compared their treatment of these elements in the 1973 EIS with the impact expected from implementation of the DDPs.
 
 
 82
 In effect, the Supervisor took the 1973 EIS and the Development Plans and seriatim compared them, interface impact one against the other so that it was not done, in our view, in a pro forma manner, or in a precipitous manner, but in a very detailed, organized, systematic and bona fide legitimate way to determine the environmental factors comparing their treatment with the '73 EIS with the impact expected from the implementation of the DDPs.
 
 
 83
 In each instance, the conclusion was the same: The degree of impact from the DDPs was consistent with that presented in the EIS. This is found at C-b Comparison Document 3-4 and C-a Comparison Document at Page 4.
 
 
 84
 The Area Oil Shale Supervisor did not make his decisions lightly or in precipitous unknowledgeable way.
 
 
 85
 The Comparison Documents that we have alluded to were but a part of the evaluation effort, which also included Decision Documents and evaluation documents.
 
 
 86
 He was supported in his efforts by an office of professional engineers and scientists representing significantly a cross-section of disciplines.
 
 
 87
 An office including mining engineers, chemical engineer, meteorologists, a geologist, hydrologists, atmospheric scientists and biological scientists, including environmental specialists in wildlife and reclamation.
 
 
 88
 We are of the view that the spirit and tenor of NEPA has been well undertaken by the Supervisor and by the Federal Defendants in this case.
 
 
 89
 It is clear that the Area Oil Shale Supervisor diligently and conscientiously made his decisions in a good faith effort to comply with the spirit, the tenor and the requirements of NEPA.
 
 
 90
 We are impressed with the thoroughness of the Oil Shale Supervisor in his discharge of his responsibilities under the program, and the Court has no difficulty in finding that the second part of the test is met.
 
 
 91
 A full reading of the DDP review documents, in conjunction with the original EIS, sufficiently establishes that there is a reasonable coverage of all of the areas required by SOIL case. The third and final part of the test is thus satisfied.
 
 
 92
 Most serious question raised by the Plaintiffs concerns the mining retorting methods ultimately proposed in the DDPs.
 
 
 93
 Plaintiffs maintain that the technology did not exist in 1973, and that the EIS could not have considered that technology or its impact.
 
 
 94
 This argument, however, is foreclosed by the specific findings made by the Supervisor. He found that, "The 1973 EIS does cover both underground mining, surface retorting and in situ development.
 
 
 95
 "The use of conventional mining methods to create permeability for in situ processing was acknowledged in Volume I of the EIS.
 
 
 96
 "In fact, modified in situ was a combination of conventional mining methods and in situ processing in the EIS."
 
 
 97
 C-b Decision Document, Page ii, and also C-a Decision Document.
 
 
 98
 They went on to conclude that despite any change in technology, there was no significant change in the environmental impact which could be expected. This is found at the Rutledge affidavit, Section 105.
 
 
 99
 The Area Oil Shale Supervisor's findings and conclusions were made in full compliance with procedures mandated by NEPA. . . .
 
 
 100
 Another aspect the Court would care to comment on deals with the approval of the rights-of-way. The Bureau of Land Management has acted on several applications for rights-of-way across Federal land that have been filed by the lessees.
 
 
 101
 And several applications can best be analyzed by considering separately the C-b road widening, the C-a corridor applications that include the roads, the transmission line and pipeline, and the C-a dam and reservoir. We have considered the BLM's decision with respect to each of those.
 
 
 102
 The C-b road widening proposal consisted essentially of elimination of steep grades and sharp curves on the road section 1.66 miles in length.
 
 
 103
 The BLM team prepared an Environmental Analysis Record and the land report on the proposal. The result was the recommendation that no EIS was needed because this was not a major Federal action affecting the environment.
 
 
 104
 Exhibit N to the Hardin affidavit, and also see Hardin affidavit at Page 14.
 
 
 105
 The application was then approved, Exhibit D.
 
 
 106
 The C-a corridor application was analyzed by interdisciplinary BLM team.
 
 
 107
 The team included experts in visual resources, surface protection, soils and watersheds, range vegetation, forestry, wildlife and others.
 
 
 108
 They prepared Environmental Analysis Record and a land report on the proposal. They determined that a supplemental EIS would not be required prior to approval of the applications because the original EIS had already covered the environmental impact of the roads and utilities corridor to service Tract C-a.
 
 
 109
 Though the '73 EIS had not analyzed the specific location of the corridor, the EIS had made it clear that rights-of-way corridors would be necessary, and had addressed the environmental consequences arising from the construction of roads, transmission lines and a pipeline.
 
 
 110
 BLM teams concluded that EIS dispensed with the need for another such statement.
 
 
 111
 Preparation of those EARs (Environmental Analysis Records) were in accordance with the administrative procedures adopted by the BLM. These procedures constitute the BLM's response to the preparation of the EARs by an interdisciplinary task force operating under agency procedures, surely as good faith constitutes a good faith effort to comply with NEPA.
 
 
 112
 The second element of the task is met here. A full reading of the EARs, in conjunction with the original EIS coverage of the proposed actions, clearly demonstrates that the discussion of all required areas of concern was a reasonable one.
 
 
 113
 Accordingly, as the BLM's findings and conclusions were made in full compliance with the procedures mandated by NEPA, this Court cannot set them aside.
 
 
 114
 In summary, we have found that the agency decisions made in '77 and '78 which determined that the DDPs and several rights-of-way application could be approved without the preparation of supplemental EIS and made in full compliance with procedures mandated by NEPA, those decisions cannot be set aside by the Court, nor is there sufficient showing to warrent (sic) this Court in reversing that action.
 
 
 115
 We are of the view that there has been compliance by the Defenjant, (sic) the Federal Defendants in this case within the spirit and tenor of NEPA within the parameters of the EIS. . . . The spirit and tenor of NEPA has continued throughout the implementation and operation of the leases.
 
 
 116
 We find it significant that there is a constant monitoring of the environmental implications under the leases.
 
 
 117
 We are of the view further that the compliance of the Federal officials in this case has not been the minimal requested or mandated by NEPA or Federal regulations, but it has gone above and beyond what we can describe as the minimal standards have that the compliance of activity by the Federal Defendants has been extensive in this project.
 
 
 118
 (R., Joint Appendix, pp. 467-481).
 
 
 119
 We agree with the District Court's findings and conclusions above recited. We are satisfied that nothing contained in the DDPs, as modified or supplemented, demonstrates any significant environmental impacts which were not identified and described in the 1973 EIS.
 
 
 120
 The technology or methodology including the modified in situ "retorting" proposed in the DDPs to be used by the C-a and C-b lessees does not involve any elements unknown, undescribed or unidentified in the 1973 EIS. The 1973 EIS reviewed the known methods relating to both underground and open pit mining, as well as surface retorting and in situ retorting techniques and their general environmental impacts. As found by the District Court, the use of conventional mining methods to create permeability for in situ processing was recognized and discussed. The modified in situ was a combination of conventional mining methods and in situ processing covered by the 1973 EIS. Thus, there are no environmental consequences presented by the modified in situ processing which were not considered in the 1973 EIS. Likewise, the environmental consequences of granting required right-of-way applications was fully addressed in the 1973 EIS. To be sure, the exact routes to be covered by the rights-of-way were not then specifically known. In contemplation of the 1973 EIS, as rights-of-way were applied for, their specific impacts upon their immediate environment were thoroughly evaluated and assessed by a team of experts in visual resources, surface protection, soils and watersheds, range vegetation, forestry, wildlife, wild horses, fisheries, meteorology, paleontology and geologic hazards, design and safety, and recreation. Environmental Defense's argument that the establishment of the rights-of-way "are geographically and functionally interrelated with the development plans and have absolutely no independent utility aside from their connection therewith" (Brief of Appellants, p. 55) misses the mark. The development plans are an integral part of the entire oil shale leasing program which was, in its entirety, the subject of the 1973 EIS.
 
 
 121
 The District Court deferred to technical determinations found by Secretary's array of experts involving highly technical matter. Such refusal to substitute the Court's judgment for that of the agency is in keeping with this rationale advanced in Federal Power Commission v. Florida Power and Light Co., 404 U.S. 453, 92 S.Ct. 637, 30 L.Ed.2d 600 (1972):
 
 
 122
 A court must be reluctant to reverse results supported by such a weight of considered and carefully articulated expert opinion. Particularly when we consider a purely factual question within the area of competence of an administrative agency created by Congress, and when resolution of that question depends on "engineering and scientific" considerations; we recognize the relevant agency's technical expertise and experience, and defer to its analysis unless it is without substantial basis in fact.
 
 
 123
 404 U.S. at p. 463, 92 S.Ct. at p. 644.
 
 
 124
 The District Court recognized, just as do we, that the Prototype Oil Shale Leasing Program is an on-going undertaking which requires careful "monitoring" assigned to the AOSS and specifically incorporated in the lease agreements. (Section 10(a)(c) and (d); Joint Appendix, pp. 176, 177). It, thus, appears that significant safeguards have been built into the Program to protect against those significant environmental impacts not identified or anticipated in the 1973 EIS.
 
 
 125
 WE AFFIRM.
 
 
 126
 WILLIAM E. DOYLE, Circuit Judge, concurring.
 
 
 127
 I concur in the result and shall briefly explain my misgivings.
 
 
 128
 This condition in this case differs from that which was before this court in Jette v. Bergland, 579 F.2d 59 (10th Cir. 1978). But its tendency is to be more similar than dissimilar. I shall mention the similar aspect first. In Jette, as here, the Department of Agriculture devised a procedure and technique which allowed it to avoid having to comply with the Environmental Impact requirements, 42 U.S.C. § 4332. It consisted of an intradepartmental study designed to ascertain whether the condition faced called for the E.I.S. procedure. A series of such studies was conducted and at the conclusion the various core drillings were completed and the environment was substantially injured without ever coming to grips with the statutory requirements. Here, an E.I.S. was prepared in 1973. However, it was "programmatic, regional and site and project specific." It included analysis of developmental plans and right-of-way approvals. So, at best, it is a projection or prophecy. True, it contains a so-called Development and Diligence plan to be filed by the lessee.
 
 
 129
 All of this procedure substantially seeks to substitute and compensate for the N.E.P.A. and the Environmental Impact Procedure, but it fails to satisfy the requirements of the law.
 
 
 130
 Similarly, the creation of the area Oil Shale Supervisor is short of E.I.S. requirements. The Supervisor has enough duties to satisfy most anything. What is lacking, however, is the commitment on the part of the Secretary and the responsibility that goes with it. He has assured the Secretary that no significant change or improvement in methodology has taken place since 1973.[1] He has concluded that no environmental impact will occur and no E.I.S. is necessary. All of this may be in accord with the Developmental and Diligence plan, but it does not satisfy the law.
 
 
 131
 Unquestionably, this entire proceeding is an "end run" which is designed to skirt N.E.P.A. as well as E.I.S.
 
 
 132
 What is the effect of all of this? No one can correctly say. It is possible that the lessees who have committed themselves to protection of the environment will fulfill the promises to the extent that it has given them. But one answer is now apparent. There exists no genuine commitment from one responsible party, the Secretary.
 
 
 133
 Why do I concur in the result while disapproving of all of the elaborate substitution procedures? It is because this nation is in the throes of an unprecedented energy crunch. It is too late to stand on ceremony. If the oil shale is to be developed, it must proceed at once. While it is permissible to lament about the failure to follow the law and failure to exact positive commitments for protection of the environment, it is no longer possible to spend precious time struggling to bring enforcement.
 
 
 134
 Neither the Department of the Interior nor any other Department should interpret this reprieve as an approval of a makeshift plan which will henceforth suffice as a fulfillment of the law. This is a ruling which governs this case and no other. The officers will, of course, be held accountable unless and until Congress releases them from their obligations.
 
 
 
 [1]
 Federally owned oil shale lands contain more than 80 percent of the entire oil shale resources located in the States of Colorado, Utah and Wyoming. Even though these lands have been subject to lease disposal under the Mineral Leasing Act of 1920, no viable leasing program was undertaken prior to the 1970's
 
 
 [2]
 We here observe that for some unexplained reason, Environmental Defense does little more than note that the leases specify that they are subject to the Department's regulations and that prior to the commencement of operations, DDPs must be submitted for approval to AOSS
 
 
 [1]
 This is bad news if it is true