**OKLAHOMA WILDLIFE FEDERA-TION, a non-profit corporation, Plaintiff,**

**and**

**State of Oklahoma, Sportsmen's Clubs of Texas, Inc., Prairie & Timber Audubon Society, Intervenors,**

**v.**

**UNITED STATES ARMY CORPS OF EN-GINEERS, John Marsh, Jr., as Secretary of the Army of the United States, E.R. Heiberg, III, as Chief of Engineers, U.S. Army Corps of Engineers Tulsa District, Frank M. Patete, as Tulsa District Engineer, Defendants,**

**and**

**North Texas Municipal Water District, and Greater Texoma Utility Authority, Intervenors.**

No. 87–C–237–B.

United States District Court, N.D. Oklahoma.

Jan. 5, 1988.

Michael C. Turpen, Victor N. Bird, Richard Gann, Tulsa, Okl., for Oklahoma Wildlife Federation.

Sara J. Drake, Asst. Atty. Gen., Environmental Div., Oklahoma City, Okl., for State of Okl.

Andrew T. Dalton, Jr., Tulsa, Okl., for Sportsmen's Clubs of Tex. and Prairie & Timber Audubon Soc., intervenors.

Tony M. Graham, U.S. Atty., Peter Bernhardt, Asst. U.S. Atty., Tulsa, Okl., for U.S. Army Corps of Engineers, John Marsh, Jr., as Secretary of the Army of U.S., E.R. Heiberg, III, Chief of Engineers, U.S. Army Corps of Engineers, Tulsa Dist., Frank M. Patete, Tulsa Dist. Engineer.

Kent L. Jones, Wm. G. Bernhardt, Tulsa, Okl., M. David Bryant, Jr., Dallas, Tex., for Northern Tex. Mun. Water Dist.

Douglas G. Caroom, Austin, Tex., and Mack M. Braly, Tulsa, Okl., for Greater Texas Utility Authority.

W. Lawrence Evans, Denison Tex., for City of Denison, Tex.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BRETT, District Judge.

This case was tried to the Court without a jury on the dates of November 23, 24, 25, 30 and December 1, 1987. The format of the trial was governed by the Court's Order on that subject of October 14, 1987, and the Pretrial Order dated November 20, 1987.

This action is one for declaratory and injunctive relief relative to a project to transfer reservoir water from Lake Texoma to Lake Lavon in North Texas, which is to be used for municipal and industrial water purposes. An intake structure and pumping units are to be constructed in Lake Texoma and a pipeline is to be constructed in North Texas. The U.S. Army Corps of Engineers (the "Corps" or "COE"), after a Finding Of No Significant Impact ("FONSI"), issued its permit to North Texas Municipal Water District ("NTMWD" or "District") and Greater Tex-

oma Utility Authority ("GTUA" or "Authority") authorizing the project.

Plaintiff, the Oklahoma Wildlife Federation ("OWF" or "Federation") and Plaintiff–Intervenors, the State of Oklahoma ("State"), Sportsmen's Club of Texas, Inc. ("SCOT"), and Prairie and Timbers Audubon Society ("Society"), assert that the Corps violated the National Environmental Policy Act ("NEPA") in granting the permit without first requiring an Environmental Impact Statement ("EIS"). Plaintiffs seek declaratory relief so finding and an injunction requesting the Corps to revoke or suspend issuance of the permit until and unless an EIS on the project is completed.

The Corps and the individual Defendants deny Plaintiffs' allegations and assert that the Corps acted in compliance with the NEPA as well as asserting various affirmative defenses.

After considering the evidence presented, arguments of counsel and the applicable legal authority relative to the issues herein, the Court enters the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Plaintiff, Oklahoma Wildlife Federation, is a non-profit corporation organized and existing under the laws of the State of Oklahoma and Section 501(c)(3) of the Internal Revenue Code. (26 U.S.C. § 501(c)(3)). Its principal office is in Oklahoma City, Oklahoma. The Federation is made up of fishermen, hunters, boaters, hikers, waterskiers and swimmers, biologists, ecologists, scientists, and naturalists dedicated to the proper management, conservation and enhancement of the natural resources of Oklahoma including, but not limited to, the conservation of lakes, rivers, wildlife, and wildlife habitats. Interests of the Wildlife Federation could be adversely affected if the Corps improperly failed to prepare an Environmental Impact Statement on this project.

2. The State of Oklahoma has interests in and around Lake Texoma relating to environmental impacts and economic impacts of this proposed project which could be adversely affected if the Corps improperly failed to require the preparation of an Environmental Impact Statement.

3. The Sportsmen's Club of Texas ("SCOT") is a Texas non-profit corporation with its principal office in Austin, Texas. Its purposes and objectives are to promote and educate in the fields of conservation, utilization, restoration, protection, and scientific supervision in the State of Texas of all game, fish, fowl, and other wildlife in its natural habitat; to promote observance and enforcement of laws for the protection of fish, game, wildlife and their habitats; to promote and influence public sentiment in favor of protection and restoration of fish, game, wildlife, and their habitat; to encourage development and wise use of the wildlife potentials of public lands and waters; to foster education of the use of Texas in areas of safety, conservation, and good sportsmanship; and to encourage purposeful production of wildlife as a valuable auxiliary by private landowners. Members of SCOT use Lake Texoma and its environs for various aesthetic and recreational and educational purposes. They also use Sister Grove Creek, Lake Lavon, and their environs for various aesthetic recreational and educational purposes. Each of these areas are areas that SCOT seeks to promote and foster conservation, utilization, restoration, protection, and scientific supervision of wildlife and habitat. The interests of SCOT and its members could be adversely affected if the Corps improperly failed to require the preparation of an Environmental Impact Statement on this proposed project.

4. The Prairie and Timber Audubon Society ("Society") is a non-profit organization organized in the State of Texas. The Society is a chapter affiliate of the National Audubon Society, Inc. The purposes and objectives of the Society are to encourage and engage in education in areas of natural history, ecology, and conservation in schools and colleges and by conducting workshops and similar activities; to promote and establish and protect and conserve wildlife habitat, and natural resources such as rivers, lakes, and streams; to support and encourage adequate laws

and regulations at the state, federal, and local levels which protect life from pollution, toxic substances, and the like; to support, promote, and ensure that laws such as the National Environmental Policy Act are implemented and that national, state, and local governments engage in environmentally and economically sound land and water resources planning, conservation, protection, and management activities. The members of the Society actively use Lake Lavon and Lake Texoma for recreation and other activities associated with the purposes of the Society. The interests of the Society could be adversely affected if the Corps improperly failed to require preparation of an Environmental Impact Statement on the proposed project.

5. The City of Denison, Texas, is a municipal corporation formed according to the laws of the State of Texas, intervening herein as amicus curiae on behalf of Plaintiffs.

6. The Defendant United States Army Corps of Engineers (the "Corps") is authorized by federal law to grant or deny the subject permit herein. Certain construction and operation elements of the proposed system are subject to Department of the Army regulatory authority under Section 404 of the Clean Water Act, 33 U.S.C. § 1344, and Section 10 of the River and Harbor Act of 1899, 33 U.S.C. § 403. The discharge of dredged and fill materials into waters of the United States for backfill and bedding during construction of the pipeline stream crossings, and the placement of concrete in waters of the United States for the outfall structure and intake structure are regulated under § 404. Construction and operation of the intake structure in and over Lake Texoma, a navigable water of the United States, is regulated under Section 10. The part of the water transfer system herein requiring an individual Department of the Army permit is the intake structure and its appurtenant features in and over Lake Texoma. Discharges of

dredged and fill material associated with the system into waters of the United States, other than those into Lake Texoma, may be authorized under one of several nationwide permits[1] issued by publication in the Federal Register.[2]

7. The Defendant John Marsh, Jr., is the Secretary of the Army of the United States. The Defendant E.R. Heiberg, III, is the Chief of Engineers, United States Army Corps of Engineers, Tulsa District. The Defendant Colonel Frank M. Patete is the Tulsa District Engineer. The Individual Defendants are proceeded against herein in their representative capacities.

8. Defendant–Intervenor North Texas Municipal Water District, is a special law district created by the Texas State Legislature to oversee the conservation, reclamation and provision of water for the North Texas area and a permittee herein.

9. (a) Defendant–Intervenor Greater Texoma Utility Authority is a special purpose governmental entity created by the Texas legislature to aid in the conservation and development of water resources in the Grayson County area and a permittee herein. GTUA supplies water to the City of Sherman, Texas, population 34,000.

(b) The City of Sherman depends entirely upon underground water from the Trinity and Woodline Aquifers as its current source of supply. The estimated reliable long term supply from this source is 9 million gallons per day. In 1980, during a drought, Sherman's daily average consumption exceeded 9 mgd. Mandatory water rationing and other conservation measures were instituted at that time. Sherman has continued to grow since 1980.

(c) In order to provide a reliable water supply, under normal and drought conditions, Sherman contends it needs to develop a surface water supply to augment existing underground water sources. Water supplied by GTUA as part of this project will

---

**1.** Nationwide Permits, 33 C.F.R. Section 330.-5(a)(7) Outfall structures; (12) Discharge of material for backfill or bedding for utility lines, including outfall and intake structures; and (26) discharges above the headwaters.

**2.** 51 F.R. No. 219, November 13, 1986.

satisfy Sherman's need for surface water supply.

(d) GTUA has filed a joint application with NTMWD for the Section 404/Section 10 permit. It plans to take water from the main transmission line approximately 10 miles from the diversion point. At this location GTUA will construct a water treatment plant that will treat Lake Texoma water for subsequent distribution within Sherman and surrounding areas.

10. The parties stipulated to the following facts (Pretrial Order filed November 20, 1987), and the Court so finds:

A. The proposed project would withdraw water from Lake Texoma through an intake structure and convey the water via pipeline. A portion of the water would be conveyed to a water treatment facility near Denison, Texas, for use by the Authority. The remaining water will be conveyed to Sister Grove Creek and Lake Lavon Reservoir, where the water would be available for use by the District.

B. The demand for water in the North Texas area has increased in the last ten years. In 1951, when the District was created, the District served approximately 32,000 people. To date, the District serves approximately 750,000 people.

C. The Authority will provide water to the City of Sherman for its municipal water supply. The City currently draws its entire water supply from underground sources. Sherman's underground water comes from the Trinity and Woodbine Aquifers in Grayson County. This supply has been inadequate to meet Sherman's needs in the past, and is inadequate to reliably supply Sherman's long-term municipal water requirements.

D. On April 1, 1985, the District and the Authority submitted their permit application, accompanied with planning and environmental information, to the U.S. Army Corps of Engineers, and upon request and receipt of additional information by the Corps, the application was considered complete by March 24, 1986.

E. Subsequent to receipt of the complete permit application, and at the Corps' request, in aid of its public interest review, the District and the Authority submitted to the Corps additional reports from environmental experts on numerous environmental issues.

F. From April 11 to August 4, 1986, the Corps conducted a notice-and-comment process that involved mailing notices of the permit application to numerous agencies and individuals, holding a formal public hearing and informal meetings, and receiving relevant information from numerous parties. The Corps received input from over 3,000 persons during the notice-and-comment period, and continued to receive additional information from public agencies in Oklahoma and Texas and private citizens until December 1986. The Corps received a letter from the Oklahoma Wildlife Federation dated July 23, 1986.

G. On December 30, 1986, the Corps issued an Environmental Assessment with respect to the proposed water project.

H. On December 31, 1986, the Corps made a Finding of No Significant Impact (FONSI) in regard to the District's permit application.

I. On the 8th day of January, 1987, the Defendants, the United States Army Corps of Engineers, Tulsa District, and Frank M. Patete, Tulsa District Engineer, issued a Permit in Application No. TXR3001311. No Environmental Impact Statement was prepared prior to the issuance of the Permit.

J. The permit authorizes construction of some elements of the project, specifically, the construction and operation of a water intake structure which will result in the placement of 1,750 cubic yards of concrete in Lake Texoma, the discharge of dredged or fill material in connection with the construction of an outfall structure in Sister Grove Creek, and stream crossings of a 25-mile long pipeline to transport the diverted water from Lake Texoma to the outfall structure. The authorized facilities will allow the cross-basin diversion of a maximum of 84,000

acre-feet of water per year from the Red River Basin (Lake Texoma) to the Trinity River Basin (Lake Lavon).

K. The District has executed an agreement with the United States to pay the government approximately Sixteen Million Dollars ($16,000,000.00) as compensation for 75,000 acre-feet of storage space in the Lake Texoma Reservoir, a necessary prerequisite to instigating the proposed project. The District has already paid an initial Seventy-Five Thousand Dollars ($75,000.00) upon the execution of the agreement, with additional payments of principal and interest of One Million Seven Hundred Eighty Thousand Seventy–Seven Dollars ($1,780,077.00) per year due in each of the next 24 years.

11. As a result of significant population increases, the District has been repeatedly required to seek and secure additional water sources. In 1951, when the District was created, the District served 32,000 people. Today, the District serves over 720,-000 people, and its population continues rapid growth. At the present time, the water supply available to the District is insufficient to meet its projected needs.

12. The District began a comprehensive search in the late 1970's to develop new water sources to service the North Texas area. As part of its effort to locate new water reserves, the District contacted several consulting and engineering firms. These water experts recommended the use of Lake Texoma waters as part of a coordinated water development effort that also included the development of an additional water reservoir (Lake Cooper) in the North Texas area to be available in 1993.

13. Both Freese & Nichols, Inc. and James M. Montgomery, Consulting Engineers, Inc., conducted studies of the capabilities and the environmental and public health ramifications of diverting water from Lake Texoma. The District also commissioned studies investigating the potential effects of a water transfer on two existing Texas reservoirs, Lake Lavon and Lake Ray L. Hubbard. Lake Lavon, located near Wylie, Texas, is the District's water storage reservoir. Lake Ray L. Hub-

bard is a Dallas water storage reservoir located immediately downstream from Lake Lavon.

14. The District directed Freese & Nichols to produce an overall environmental assessment of the project to supplement the environmental assessment being prepared by the District itself. All of these studies uniformly recommended the use of Lake Texoma waters and revealed that the environmental effects of the project would not be significant.

15. Pursuant to the Red River Compact, entered into by the States of Oklahoma, Texas, Arkansas and Louisiana, the waters of Lake Texoma are available to be withdrawn in equal shares by the States of Oklahoma and Texas. The State of Oklahoma has recently confirmed that it is the State's desire that the waters of Lake Texoma be made available for municipal drinking purposes by the United States Army Corps of Engineers, which constructed the Lake and administers its operations. Administrative Record (AR) 2153.

16. The Texas Water Commission, acting upon the District's application and pursuant to the Red River Compact, allocated 84,000 acre-feet of water per year from the Texas share of Lake Texoma to the District. The volume of water contained in Lake Texoma is approximately 4,000,000 acre-feet. The annual inflow of waters into Lake Texoma is in excess of 4,000,000 acre-feet per year. The volume of waters discharged annually through the Denison Dam at Texoma is in excess of 3,000,000 acre-feet per year.

17. In order to proceed with the withdrawal of this water pursuant to the Texas Water Commission permit, the District was required to enter into a storage contract with the United States (through the Corps of Engineers) by which water withdrawal rights in the amount of 75,000 acre-feet per year were reallocated to the District for municipal and industrial water supply from the hydroelectric generating pool. This reallocation was the subject of an environmental assessment ("EA") and FONSI signed by the District Engineer ("DE") on July 26, 1984. AR 101. "Storage" rights

in the amount of 75,000 acre-feet are calculated to yield an annual supply of 84,000 acre-feet of water. Pursuant to the storage contract, the District is contractually committed to a ten-year fee in excess of Sixteen Million Dollars ($16,000,000.00) as compensation to the United States for the right to withdraw water from the 75,000 acre-feet storage area. AR 101, Federal Defendants Exhibits 2 and 3.

18. The maximum amount of water that could be withdrawn pursuant to the District's state permit and federal storage contract constitutes approximately two percent of the water entering Lake Texoma each year and approximately three percent of the amount of water that is currently discharged from the dam at Lake Texoma each year.

19. After the storage contract was obtained, the District was required to obtain an additional permit from the State of Texas for a twenty-five mile long pipeline to transport the water from Lake Texoma into Sister Grove Creek, a tributary of Lake Lavon. After technical reviews and participation by the City of Dallas and other municipal bodies, the Texas Water Commission concluded that the proposed transfer should be granted. The Texas Water Commission granted the permit, allowing the District to divert 84,000 acre-feet of water per year and allowing the District to use the bed and banks of Sister Grove Creek to transport the water from Texoma to Lavon. AR 219.

20. The Texas Water Commission also certified, pursuant to Section 401 of the Clear Water Act, codified at 33 U.S.C. § 1341, that the discharge of dredge-and-fill material into state waters during the construction of the proposed facility would not cause a violation of Texas water quality standards. AR 278, 1258.

21. On April 1, 1985, NTMWD and GTUA jointly applied to the Tulsa District, COE, for an individual Department of Army permit for the construction and operation of a water intake structure in Lake Texoma. It is the granting of this permit by the Corps that the Plaintiffs challenge herein. Upon requests for and receipt of additional information by the Corps (See, e.g. AR 155, 181, 189, 205, 221, and 231), the application was considered complete by March 24, 1986. AR 247.

22. Portions of the system are located in two different COE Districts—Tulsa District and Fort Worth District. The Tulsa District was designated the lead district for conducting the public interest review of the system because the intake structure and most of the pipeline would be located in the Tulsa District and because only the intake structure requires an individual permit.

23. A 30–day Public Notice describing the intake structure was issued on April 11, 1986. AR 256. Approximately 2000 letters were received in response to the notice. The majority of the letters were "form" letters raising a concern that the system would increase lake level fluctuations and thereby adversely affect Lake Texoma recreation and tourism.

24. Subsequent to the close of the first Public Notice, a policy letter was issued by the COE Deputy Director of Civil Works which, in effect, prohibited, in cases such as this, the general practice of authorizing by a nationwide permit those individual features of a larger project where an individual permit is also required. AR 338. In response to this policy change, a second 30–day Public Notice including a notice of a public hearing was issued on June 25, 1986. AR 491. The second Public Notice described both the intake structure as well as those features of the overall system such as the discharges associated with the pipeline stream crossings and the outfall structure in waters of the United States, otherwise permitted under nationwide permits. This policy change was later rescinded, thus obviating the need to include in the individual permit those activities authorized under nationwide permits.

25. On June 13, 1986, a Public Notice for a public meeting was issued by the District Engineer to be held on July 15, 1986, at Grayson County College, Denison, Texas. This notice was mailed to the persons and entities contained on a special mailing list maintained by the Corps. AR 403–441. On June 25, 1986, a second notice

was issued, providing for a public hearing, pursuant to 33 C.F.R. Section 327. AR 491–527. The Plaintiffs SCOT and Society were not on the mailing list of any of said notices and did not participate in any of the public hearings.

26. The public hearing was held on July 15, 1986, AR App. H, and 237 persons attended the hearing. AR 618–736. The Federation was not represented at the hearing.

27. At the request of the attorney for the Lake Texoma Association ("LTA"), the public comment period was extended to August 4, 1986. AR 1013. Approximately 1,000 additional letters were received during the second public comment period.

28. U.S. Fish and Wildlife Service ("USFWS"), Texas Parks and Wildlife Department ("TPWD"), the Oklahoma Department of Wildlife Conservation ("ODWC"), and many members of the public, requested that an EIS be prepared. AR 333, 336, 615, 774, 1048, and 1185.

29. The Oklahoma Wildlife Federation requested that an environmental impact assessment be prepared. AR 850.

30. The United States Environmental Protection Agency commented, among other things, that available water quality data does not indicate that the discharge would have a significant effect on aquatic life in Lake Lavon, and did not request an EIS. AR 285, 838.

31. The National Marine Fisheries Service of the United States Department of Commerce commented that any adverse effects that might occur on marine and anadromous fishery resources would be minimal and therefore did not object to the issuance of the permit. AR 779.

32. The Texas Historical Commission and the Oklahoma Department of Tourism responded but did not request an EIS. AR 313 and 851.

33. The Texas cities of McKinney, Wylie, Garland, Forney, Farmersville, Richardson, Rockwell, Kaufman, Allen, Rowlett and Sherman, among others, responded and requested the permit be issued. AR 562, 571, 581, 610, 613, 769, 770, 822, 852, 862, 878.

34. On July 29, 1986, the environmental specialist charged with the responsibility to process the permit within the Corps summarized the environmental issues raised during the public notice comment period. AR 954.

35. On July 31, 1986, NTMWD prepared a response to the various comments received during the public notice comment period. AR 1008.

36. On August 5, 1986, NTMWD responded to the District Engineer regarding the comments and criticisms of the proposed project during the public comment period. AR 1054.

37. The Corps conducted meetings with the federal and state wildlife agencies and the applicants on August 15 and 19, 1986, to discuss the material issues raised during the public comment period. AR 1092–1095, 1131.

38. On September 15, 1986, the District Engineer granted the applicants an extension of approximately 30 days in order to give the applicants time to address and/or mitigate issues identified during the continuing environmental review and in order to assure that all factors had been considered by the Corps necessary to render a good faith decision. AR 1323.

39. On September 16, 1986, the District Engineer forwarded a summary of the issues received in response to the public notice to NTMWD for resolution or rebuttal. AR 1331–1333. A meeting was held between the Corps and NTMWD and GTUA on September 22, 1986, to discuss the protocol for the extension period granted September 15, 1986. AR 1372. An impact analysis summary and impact analysis matrix were prepared by the Corps. AR 1394–1395.

40. Subsequent to additional contacts between the applicants, the federal and state resource agencies, and the LTA, the applicants furnished detailed information to the Corps and these agencies regarding specific elements of the proposal and an evaluation of the anticipated impacts.

Based upon these meetings and the resulting information, the federal and state wildlife agencies withdrew their requests for an EIS provided certain conditions were met. AR 1557, 1620, and 1654.

41. Based upon the information gained through the public comment period, the above-referenced meetings, public hearing, and additional information furnished, various divisions of the Corps prepared draft environmental assessments for the consideration of the District Engineer representing various and different viewpoints of the experts within the Corps who were responsible for reviewing the information provided in connection with the permit application. These drafts were prepared with input from the Planning Division (Environmental Resources Branch), Engineering Division, and Operations Division. See organization charts. Federal Defendants' Exhibit No. 9. The various drafts exposed the District Engineer to the different viewpoints held by the various experts charged with the responsibility on behalf of the Corps to review all of the necessary information in order to reach an informed decision. AR 1208, 1266, 1445, 1571, 1661, 1689, and 1800.

42. The District Engineer had numerous meetings with members of his staff, including the environmental experts charged with the responsibility of evaluating all of the environmental concerns raised, and thoroughly considered their advice, which in some cases and at certain times called for the issuance of an EIS and in other cases and at later times consisted of the opinion that an EIS was unnecessary.

43. The Corps worked closely with the state and federal wildlife agencies in considering the possibilities of mitigating the environmental concerns by the addition of special conditions to the permit. The wildlife agencies drafted several special conditions which were considered by the Corps and assembled in a final draft which was submitted to all of these agencies for final comments. AR 1722-1729, 1785.

44. After several drafts, AR 1737, 1790, an executive summary with special conditions was prepared for informational purposes. AR 1832.

45. For a time the District Engineer leaned toward directing that an EIS be performed. After further consideration, however, and balancing the interests involved, considering the comments during the public interest review and the conditions provided by the federal and state wildlife agencies as well as an evaluation of the additional information provided by the applicants, the District Engineer decided that the issuance of the permit was in the public's interest. The permit was subject to placing on it specified conditions, as recommended by the wildlife agencies, to insure that any potential for adverse environmental effects from the proposed project would be promptly detected and eliminated or mitigated to an acceptable level.

46. The District Engineer concluded, based upon the advice of the state and federal wildlife agencies and the experts on his staff, that the preparation of an EIS under 42 U.S.C. § 4332 was not required. The special conditions to the permit would actually result in better, more detailed, and more useful information with respect to any potential effect on the environment, and provide a mechanism for controlling those potential effects.

47. The District Engineer considered the special conditions suggested by the wildlife agencies to be more beneficial for the protection of the environment than would have been the preparation of the EIS, particularly in view of the probability that many of these special conditions may not have been included if a permit had been issued after an EIS had been done.

48. On December 31, 1986, the District Engineer signed an EA and FONSI. AR 1839, 1866. On the same date the District Engineer signed a Statement of Findings. AR 1872. The EA contained the special mitigating conditions requested by the wildlife agencies.

49. A previous transfer of water from the Red River system to the Trinity Basin System (which includes Lake Lavon) had been made from 1954 to 1957 to provide

water to the Dallas area during a period of severe drought. Such transfer was previous to adoption of the NEPA. Additionally, however, the issuance of a pumping permit by the Corps is an action normally not requiring a full environmental impact statement. The proposed transfer was therefore not "unprecedented," and the Corps was not required to wait thirty days before approving the permit, pursuant to 40 C.F.R. § 1501.4(e)(2).

50. A permit for the construction and operation of the intake structure and discharge of dredged and fill material into waters of the United States associated with the construction of the system was signed by the applicants on January 7, 1987, and by the District Engineer on January 8, 1987. The permit contained the special conditions requested by the wildlife agencies and set forth in the EA. AR 1921.

51. Since the approval of the project, the District has already paid an initial Seventy–Five Thousand Dollars ($75,000.00) pursuant to its storage contract, with additional payments of principal and interest of One Million Seven Hundred Eighty Thousand Seventy–Seven Dollars ($1,780,077.00) per year due in each of the next twenty-four years.

52. Approximately fifty percent of the necessary rights-of-way have been acquired for the pipeline and a property easement has been granted by the Corps for the construction of the pump intake structure. Right-of-way acquisitions are continuing. Engineering plans and specifications are complete and construction has begun on the intake structure. The pump motors and miscellaneous valve equipment have been bid and approved by the District's Board of Directors. Construction contracts committing Six Million Dollars ($6,000,-000.00) of District funds have been awarded.

53. The Corps of Engineers has assembled an Administrative Record, compiling the numerous studies, documents, diagrams, correspondence and other information considered by the Corps during the permit application process. The record contains over 3,000 pages bound in six dif-ferent volumes, with ten separate appendices consisting of studies, reports and other documents relating to its environmental inquiry.

ISSUES PRESENTED BY THE PLAINTIFFS

54. Plaintiffs assert that an EIS should be prepared because of the following perceived environmental concerns:

(1) Lack of precedent for interbasin water transfer;

(2) Effect on the striped bass fishery, other species of fish, flora and fauna;

(3) Effect on the "refuge zone" for such fish in Lake Texoma (stratification);

(4) Fish stress and mortality in Sister Grove Creek;

(5) Bank stability of Sister Grove Creek;

(6) Diversion of organisms from the Red River System to the Trinity River System;

(7) Stratification in Lake Lavon—water quality;

(8) Effect on the shovelnose sturgeon and other endangered species;

(9) Effect on the Lake Texoma recreation industry; and

(10) Lack of consideration of alternatives involving water conservation including changes in rate structures.

55. *Lack of precedent for interbasin water transfer.* The project is not unprecedented and there was accordingly no need to make the FONSI available for public review for 30 days prior to the issuance of an EA. 40 C.F.R. Section 1501.4(e)(2)(ii).

There is an established history of interbasin transfers of water, including the mixing of high-chloride content waters with low-chloride content waters to improve water quality for water supply. AR 26–26, 37–38, 1105–06, 1148–49, 1261–62. In California, interbasin transfers have involved the transfer of water with rather high total dissolved solids levels for mixing with higher quality water, essentially the same as the purpose of the project involved in this permit. Neither would this be the first transfer from the Red River to the Trinity River basin. During 1954, 1955, and 1956,

water was diverted from the Red River above Lake Texoma to the Trinity River basin. That transfer of 65,000 acre-feet of water from Lake Texoma to Lake Dallas was to provide emergency water for the use of the City of Dallas. AR 26–27, 29–41, 1105, 1106, 1148, 1149, 1261, and 1262.

56. *Effect on the striped bass fishery, other species of fish, flora and fauna.* This concern has been addressed by special permit conditions recommended by the state and federal wildlife agencies, including the USFWS. The permittees will be required to conduct detailed studies to acquire information on base line and project operation. To avoid possible entrainment of fingerling striped bass as well as some other small fish, the intake structure will be covered with a 0.5 inch screen. Pump velocity will not exceed 0.5 feet per second at any time to prevent fish impingement. AR 1921, 1930, 1931.

57. *Effect on the "refuge zone" for such fish in Lake Texoma (stratification).* In its complaint, the Federation alleges that the Corps did not consider the ramifications of the project on the striped bass fishery and whether the proposed withdrawal would affect the "comfort zone" or epilimnion during the summer months. The "comfort zone" is described as an area of cool, oxygenated water that forms approximately 25–45 feet below the surface of a lake during the hottest period of the summer. The Administrative Record, however, contains numerous references to this issue, evidencing that the Corps made a good faith effort to consider and analyze this asserted problem. AR 41, 101, 333, 336–37, 452, 576–77, 594, 602–03, 838, 954–55, 774, 1048, 1056–57, 1094, 1101, 1103, 1120, 1125, 1172, 1262, 1378, 1608, 1610, 1686, 1800, 1824, 1872, 1921, 1930–31, 1939, 1986, 1998, 2025, 2040, 2139–40, Appendix A, D, G, H, pp. 41, 44, and J.

58. The Corps reviewed a memorandum from Tom Gooch of Freese & Nichols, Inc.

dated August 18, 1986 (AR 1120), entitled, "Response to Concern Over Impact of Withdrawal from Lake Texoma on Striped Bass Habitat," which concluded that the amount of withdrawal from the epilimnion would not be significant. At the rate of withdrawal the pump station would sustain, no more than 3 inches of water could be withdrawn from this twenty-foot thick "comfort zone" during the ninety-day period of concern each year. Furthermore, Gooch explains that, as water is withdrawn from the epilimnion, diffusion and mixing will continually replenish this "comfort zone" by reestablishing the same temperature gradient in the reservoir. Therefore, the withdrawal of water will not significantly affect thermal stratification in Texoma.

59. Both the Oklahoma Department of Wildlife Conservation, the Texas Parks & Wildlife Department and the U.S. Department of the Interior–Fish & Wildlife Service submitted mitigating conditions to the permit designed to eliminate any unacceptable threat to the epilimnion or striped bass. These groups indicated that if the permit conditions were adopted, the project would be environmentally acceptable. Those conditions were attached to the permit.[3]

60. The Environmental Assessment, issued by the Corps on December 30, 1986 (AR 1800), concludes that the Lake Texoma project will have no significant impact on the striped bass or any other fish. "The USFWS, ODWC, and TPWD initially expressed a concern that epilimnetic withdrawals would significantly impact the 'thermal refuge' areas required by striped bass and result in significant summer die-offs. Subsequently, these agencies have determined that special permit conditions would reduce the impacts to striped bass, if any, to an acceptable level."

61. The permit (AR 1921) contains a general condition stating that "the permit-

---

**3.** The Corps also reviewed an article from the August 1986 issue of *Scientific American* by Charles C. Coutant (one of the Federation's witnesses), entitled "Thermal Niches of Striped Bass," and an article from Volume 114 of the American Fisheries Society by William J. Math-

ews, Loren G. Hill and Scott M. Schellenhaus from the Biological Station and Zoology Department of the University of Oklahoma, entitled "Depth Distribution of Striped Bass and Other Fish in Lake Texoma (Oklahoma–Texas) During Summer Stratification."

tee agrees to make every reasonable effort to prosecute the construction or operation of the work authorized herein in a manner so as to minimize the adverse impact on fish, wildlife, and natural environmental values." Additionally, Special Condition No. 1 states that "[t]he permittees shall conduct a study relating to the impact of the intake operation on the stratification process and fishery, particularly striped bass, in Lake Texoma."

62. Special Condition No. 2 (AR 1930) to the permit states that in order "[t]o establish withdrawal depths that will have minimal, if any, effect on the fishery, an 'exclusion zone' shall be created." The permit conditions are discussed in a Fact Sheet generated by the Corps and dated February 20, 1987. The Fact Sheet explains that the exclusion zone "condition specifies that no withdrawals will be allowed from 25–47 feet below the existing lake surface elevation, during the time period of June 15 through October 15." Another special condition requires that a study be conducted to ascertain the impact of the intake operation on the lake stratification process, particularly as it relates to the striped bass fishery. The study will include the seasonality, intensity, and extent of any negative interactions, particularly on the summer "comfort zone" used by the striped bass, caused by the withdrawal of surface (epilimnion) water. The study will begin one year before the project becomes operational and will continue for a minimum of two years after withdrawals commence. Therefore, the study will provide a comparison of pre- and post-project conditions. If the study shows that an unacceptable deterioration in water quality or in fishery habitat has resulted from the project, the District Engineer has the option to modify the permit or require further study.

63. *Fish stress and mortality in Sister Grove Creek—Bank Stability of Sister Grove Creek.* The Federation also alleges that the Corps did not consider the possibility that the project could produce an "artificial flow of water" or "variable discharge of water" into Sister Grove Creek, affecting the stability of the creek's bank and ecosystem, as well as causing bank deterio-

ration. The Administrative Record, however, contains numerous references to this issue, evidencing that the Corps made a good faith effort to consider and analyze this asserted problem. AR 109, 220, 316, 334, 594, 603, 616, 957, 1049, 1054, 1071, 1095, 1102, 1136–37, 1171, 1261, 1395, 1558, 1611, 1721, 1800, 1921, 1931, 2139–40. Appendix G and J.

64. In a response prepared by the District and dated July 31, 1986, the District explains various measures taken to prevent any danger to Sister Grove Creek. AR 1101. "The NTMWD pump station will have two 45 MGD Pumps and three 6 MGD Pumps. The normal maximum diversion rate, when pumping, would be 45 MGD or approximately 70 CFS. The channel has been investigated by Freese & Nichols, Inc., Consulting Engineers, and found that the existing channel was capable of handling at least four times the flow. The Soil Conservation Service ("SCS") was contacted and confirmed the conditions and capacity of Sister Grove Creek. The SCS records maintain that the minimum channel carrying capacity downstream of the proposed discharge was 295 CFS or over double the maximum capable pumping capacity of the NTMWD."

65. Technical data on this issue was presented to the Corps by Steven P. Watters, James C. Randolph and James C. Staves, respectively, fish and wildlife biologist and environmental specialists for the Corps.

66. Letters from the Texas Parks & Wildlife Department and the Department of the Interior–Fish & Wildlife Service requested that special conditions be attached to the permit in order to prevent any possibility of adverse consequences to Sister Grove Creek. The permit conditions were adopted. AR 1558, 1930–31.

67. The Corps' Environmental Assessment states that there will be no significant physical or biological impacts to Sister Grove Creek or adjacent land areas as a result of the proposed project. The Assessment also contains a specific discussion of all foreseeable physical impacts on Sis-

ter Grove Creek. The discussion concludes that the increased flow will not significantly affect the hydrology or the banks of the creek. AR 1800.

68. The permit contains three special conditions specifically designed to prevent impacts to Sister Grove Creek. Special Condition No. 3 requires the cessation or stepdown of pumping and discharge to Sister Grove Creek in order to avoid fish stress mortality. The condition provides that the District will monitor for entrapped fish on a regular basis. Special Condition No. 4 requires the District to monitor the interbasin transport of viable fish and invertebrates from Lake Texoma to Lake Lavon by using drift nets in Sister Grove Creek. Samples and data shall be collected and forwarded to the District Engineer. Special Condition No. 5 states that the District shall monitor the bank stability of Sister Grove Creek semiannually to compare pre-project and post-project rates of bank failure and consider the need for corrective action. The results of the monitoring shall be promptly reported in writing to the District Engineer who shall then order any necessary corrective or preventative measures. AR 1930–31.

69. *Diversion of organisms from the Red River System to the Trinity River System.* The Federation also alleges that the Corps did not consider the consequences of the proposed project on the transfer of organisms, fish, flora and fauna from the Red River Basin to the Trinity River Basin. The Administrative Record, however, contains numerous references to this issue, evidencing the fact that the Corps made a good faith effort to consider and analyze this asserted problem. AR 30, 37, 101–02, 316, 336–37, 452, 576–77, 594, 601, 616, 779, 838, 954, 958, 1049, 1056, 1071, 1083, 1085, 1094, 1101, 1105, 1109, 1126, 1157, 1171, 1246, 1261, 1395, 1553, 1559, 1611, 1800, 1872, 1921, 1939, 1986, 1999, 2040, 2139–40, Appendix A, G, H and J.

70. A letter from the Chief of the Operations Division of the Corps' Fort Worth District, dated August 11, 1986, states that no problem is posed by the potential trans-

fer of organisms because "parasites, disease organisms, and invertebrates are generally the same on a region-wide basis and are not usually species specific. They may be transported by birds, boats, and other means from lake to lake." AR 1071. Bait bucket transfers are common from lake to lake in Oklahoma and Texas.

71. Another Corps document entitled, "Lake Texoma–Lake Lavon Water Transfer Pipeline," dated August 13, 1986, states that "it is unlikely that the transfer of significant pathogens will be a concern between these two water bodies. The pathogens already present in separate river systems will be very similar, occurrence being a function of regional proximity and environmental similarity rather than true host specificity. Many of these waterborne pathogens can be readily transported via airborne and terrestrial vectors as well." AR 1083.

72. Letters from the Texas Parks & Wildlife Department and the Department of the Interior–Fish & Wildlife Service recommended permit conditions requiring monitoring of the transport of viable fish or invertebrates by the use of drift nets, and the prevention of entrainment and impingement of fish by means of intake screens. Both groups indicated that if the permit conditions were adopted, the project would be environmentally acceptable. AR 1559, 1611.

73. The Environmental Assessment produced by the Corps discusses special precautions taken to prevent any dangerous transfer of organisms. The Assessment notes that pumps have a screened inlet valve, the depth of which can be adjusted as necessary and concludes that no significant environmental impact on the entrapment or impingement of fish will result from the proposed project. The Assessment states that "[i]ntake design modifications to prevent entrainment and impingement of fish would mitigate concerns about the transfer of fish. The intake structure would have 0.5 inch mesh screens to reduce the entrainment of adult fish." AR 1800.

74. Three of the permit's special conditions are related to this issue. Special Con-

dition No. 3 states that the cessation of pumping and discharge to Sister Grove Creek shall be attenuated to prevent the potential stranding of fish in Sister Grove Creek. Special Condition No. 4 states that the District shall "monitor the inter-basin transport of viable fish (eggs, larvae, or fingerlings) and invertebrates from Lake Texoma to Lake Lavon by use of drift nets at three locations in Sister Grove Creek." The samples shall be collected and analyzed, and information gathered shall be forwarded to the District Engineer. Special Condition No. 11 states that "[i]n order to reduce the potential for the transfer of organisms from the Red River system to the Trinity River System, the pump intake structure in Lake Texoma will be covered by screens with a mesh size no larger than 0.5 inches." AR 1930–32.

75. As discussed in a Fact Sheet prepared by the Corps on February 20, 1987, the discharged water will be monitored to determine if any organisms are being transferred through the pipeline. "However, there have been numerous opportunities for interbasin organism transfer in the past. These include a transfer of water from the Red River to the Trinity River during a drought from 1954–1957." AR 1999. The evidence before the Corps indicated that no unique or significant harm is presented by the proposed Texoma to Lavon transfer.

76. *Stratification in Lake Lavon—Water Quality Issues.* The Federation also alleges that the Corps did not consider the potential for the proposed project to result in higher concentrations of sodium, chloride, sulfate, and dissolved solids in Lake Lavon, or to create a "saline gradient" in that lake, thereby affecting lake water quality. The Administrative Record, however, contains numerous references to this and other water quality issues, evidencing that the Corps made a good faith effort to consider this potential problem. AR 3, 42, 84, 106, 155, 162, 167, 189, 199, 203, 220, 334, 336, 452, 545, 602, 737, 954–55, 1010–11, 1049, 1058, 1071, 1081, 1085, 1123, 1172, 1262, 1395, 1607, 1611, 1873, 1800, 1921, 1998, 2070, 2072, Appendix C, E, F and G.

77. At the request of the Corps, the District initially submitted "a report on future water quality in Lake Lavon and Lake Ray Hubbard." A subsequent study prepared by the District, dated July 30, 1986, discusses several water quality issues. The District states that "the average annual discharge from Lake Texoma Dam for the period 1945–1983 was 3,141,000 acre-feet. The proposed diversion of approximately 30,000 acre-feet is less than one percent (1%) of downstream releases. Even at the maximum permitted diversion of 84,000 acre-feet, the downstream releases would be reduced by approximately 2.6%. It is inconceivable that this reduction would significantly affect downstream fisheries or water quality." AR 1010–11.

78. The Corps received a study performed by John Mancini, a scientist who wrote the "EPA Manual For Water Quality Models For Stream and Lake Modeling." Mancini discusses a theory proposed by a Dr. Warwick (one of plaintiffs' witnesses), that the proposed transfer could result in a "salinity gradient" in Lake Lavon. Mancini determined that there would be no problem with stratification within Lake Lavon because of the continual and seasonal mixing of the waters induced by wind, current, and temperature changes. Mancini further noted that if such a gradient developed, there were many available methods (some of which are already in place and others that the Corps retains discretion to require use of in the future) that could be utilized to correct the problem, such as the physical mixing of Lavon by pumps and aeration of the waters. AR 1262.

79. Letters from the United States Department of the Interior–Fish & Wildlife Service proposed that conditions be added to the permit to assess the effects of the water transfer on water quality in Lavon. AR 1611. These conditions were incorporated into the permit by the Corps.

80. The Corps' Environmental Assessment notes that the depth of the screened inlet valve can be adjusted to "allow variance of the inlet elevation to avoid poor quality water." The Assessment states that the project will have no significant

environmental impact on water quality in Lake Lavon and that the District will monitor water quality and take any necessary corrective action. The Assessment also contains a detailed discussion of potential water quality impacts on Lake Lavon, concluding that "no long term increase in such a density gradient would be reasonably expected to result because the lake destratifies each year in early fall and continues to remain completely mixed until the following summer.... Water quality monitoring of Lake Lavon accompanied by appropriate operational modifications of the proposed system would prevent increases in the size of any density gradient should one occur." AR 1800.

81. A study prepared by Freese & Nichols on future water quality in Lake Lavon states that although the mineral concentrations in Lake Lavon resulting from the project would be slightly higher than they would otherwise be, they would still be within acceptable Texas drinking water standards. Even in the worst case analysis, the worst month mineral concentrations in Lakes Lavon and Hubbard remain well within the acceptable drinking water standards. Appendix F.

82. The permit contains two general conditions and one special condition relevant to this issue. General Condition No. 1.b states that "all activities authorized herein shall, if they involve, during their construction or operation, any discharge of pollutants into waters of the United States or ocean waters, be at all times consistent with applicable water quality standards." General Condition No. 1.f further requires that "the permittee agrees that he will prosecute the construction or work authorized herein in a manner so as to minimize any degradation of water quality." Special Condition No. 8 specifically provides that the District will compile information "for use in protecting the water quality of Lake Lavon," and that the District "shall collect baseline water quality data from Lake Lavon prior to initiation of withdrawal of water from Lake Texoma in order to adequately compare pre-project and post-project conditions." This condition also requires a study to be conducted two years

after water diversion from Texoma begins, in order to assess any effects of the water transfer on water quality conditions. In Special Condition No. 10 to the permit, the Corps specifically retained authority to require future equipment or operational modifications to remedy or remove any water quality condition that could, even hypothetically, arise in the future. AR 1930–31.

83. *Effect on the shovelnose sturgeon and other endangered species.* The shovelnose sturgeon is not a federally-listed threatened or endangered species. The District Engineer, after consultation with the United States Fish and Wildlife Service, properly concluded that no federally-listed threatened or endangered species will be adversely affected by the permitted project. The shovelnose sturgeon is listed by the Texas Parks and Wildlife Department as an endangered species for Grayson County. The Texas Parks and Wildlife Department did not comment that the shovelnose sturgeon would be adversely affected. The shovelnose sturgeon is rarely, if at all, found in Lake Texoma, in that it prefers a river environment. The river habitat of this fish will not be adversely affected by the project.

84. *Effect on the Lake Texoma recreation industry.* The Federation also alleges that the Corps did not consider the consequences of the proposed project upon the recreation industry in Texoma, and particularly the effect of lake level fluctuations on recreation. The Administrative Record, however, contains numerous references to this issue, evidencing that the Corps made a good faith effort to consider and analyze this asserted problem. AR 3, 101–102, 137, 162, 189, 316, 329, 330, 390, 452, 576, 594, 601, 745, 813, 954, 1009–10, 1058, 1068, 1135, 1320, 1395, 1626, 1800, 1938, 1985, 1996, 2001, 2037–38, 2040, 2141, 2153, Appendix G and H.

85. An Environmental Assessment issued by the Corps in 1985 permitted the reassignment of 150,000 acre-feet of hydropower storage in Lake Texoma to municipal and industrial water supply storage sites. The Assessment noted that the reassignment of storage would not impact ex-

isting lake levels or pool fluctuations. AR 1800.

86. In the transcript of the public hearing held by the Corps on July 15, 1986, Colonel Tilton (then the District Engineer of the Corps' Tulsa District Office) explains that the Corps' hydrologic studies indicate that this proposal would result in no appreciable impact to the surface level of Lake Texoma. This is true because of the fact that this proposal would not represent a new withdrawal from the lake, but merely a reallocation of a previously existing allocation of water from hydropower to municipal water supply. The same water in this case, instead of spilling through the dam would be transported via the proposed pipeline to Lake Lavon. AR Appendix H.

87. In a Fact Sheet prepared by the Corps and dated February 20, 1987, the Corps has observed that, based upon its own studies, the project would cause the lake surface to drop only .05 inches in a day, .38 inches in a week and 1.6 inches in a month, even assuming that absolutely no water flowed into the lake (a condition that has not existed since the lake was formed). AR 1996.

88. *Lack of consideration of alternatives involving water conservation including changes in rate structures.* The Federation now asserts that the Corps did not consider "nonstructural" alternatives to the project, specifically, water conservation efforts to effect a reduction in water consumption in the North Texas area. The Administrative Record and the affidavits submitted by the Corps, however, evidence the fact that the Corps considered and evaluated water conservation measures both when it considered the permit reallocating Texoma water from hydropower to municipal and industrial uses, and when it considered the permit plaintiffs challenge in this action. AR 316, 341, 1058, Appendix H, pages 34–36.

89. A Public Notice Response Summary drafted by the Corps notes that the water conservation issue was raised during the public notice period and subsequently considered by the Corps. At the Corps' request, both the Authority and the District submitted information discussing their conservation efforts. Jerry Chapman, General Manager of the Authority, submitted detailed information regarding the Authority's conservation efforts, its compliance with the conservation regulations of the Texas Water Development Board, and conservation ordinances passed by cities serviced by the Authority. AR 316.

90. Similarly, Carl Riehn, Executive Director of the District, submitted information regarding the District's water conservation efforts, particularly the Wilson Creek waste water treatment plant, the largest such plant in the state, with the ultimate capacity to discharge over 26,900 acre-feet of water annually. Riehn also discussed the District's water conservation program at the public hearing conducted by Colonel Tilton at Grayson County Junior College, Denison, Texas, on July 15, 1986. Riehn discussed the District's compliance with the conservation standards established by the Texas legislature, its efforts regarding retrofitting of plumbing fixtures, and its efforts to process and recycle waste water. AR 1058.

## CONCLUSIONS OF LAW

1. Jurisdiction herein is based upon the following:

(A) 28 U.S.C. § 1331, the action arising under the laws of the United States, specifically, the National Environmental Protection Act ("NEPA"), 42 U.S.C. § 4321, *et seq.;*

(B) Section 10 of the Administrative Procedure Act, 5 U.S.C. §§ 701–706, as the action is brought by persons allegedly suffering legal wrong because of agency action;

(C) 28 U.S.C. §§ 2201–2202 as Plaintiff seeks a declaration of rights under NEPA; and

(D) 28 U.S.C. § 1361 as the action is one in the nature of mandamus to compel an officer or employee of the United States or an agency thereof to perform a duty owed Plaintiff.

2. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(e).

3. Any Finding of Fact which might more properly be characterized a Conclusion of Law is incorporated herein.

4. The Intervening Plaintiffs, State of Oklahoma, SCOT, and Society, have standing herein, both as a result of the facts established by the evidence and the stipulations of the parties. *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

STATUTORY FRAMEWORK AND REGULATIONS

5. Section 102 of NEPA provides that all major federal actions significantly affecting the quality of the human environment must be accompanied by a detailed statement assessing the environmental impact of the proposed action. The detailed statement is known as an Environmental Impact Statement. 42 U.S.C. Section 4332(1)(C). NEPA establishes the Council on Environmental Quality ("CEQ") which has promulgated regulations on procedures regarding EIS preparation. Adherence to these guidelines is mandatory for all federal agencies. *National Indian Youth Council v. Watt,* 664 F.2d 220 (10th Cir. 1981).

6. The CEQ regulations allow federal agencies to make a preliminary Environmental Assessment to determine whether the environmental effects of a proposed action are significant. 40 C.F.R. § 1508.9 (1986). The regulations define an EA as a concise document that briefly discusses the relevant issues and either reaches a conclusion that preparation of an EIS is necessary or concludes with a Finding of No Significant Impact. 40 C.F.R. § 1508.13 (1986).

■ 7. In preparing the EA under its regulatory authority, the Corps has broad jurisdiction to consider environmental impacts. However, this jurisdiction must be exercised within the scope of the agency's authority. *Winnebago Tribe of Nebraska v. Ray,* 621 F.2d 269 (8th Cir.), *cert. denied,* 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980); *Save the Bay, Inc. v. Corps of Engineers,* 610 F.2d 322 (5th Cir.), *cert. denied,* 449 U.S. 900, 101 S.Ct. 269, 66 L.Ed.2d 130 (1980).

8. NEPA at 42 U.S.C. § 4334 specifically provides that nothing in §§ 4332 or 4333 shall in any way affect the specific statutory obligations of any federal agency to comply with other environmental criteria, to consult with other federal or state agencies, or to act or refuse to act upon the recommendations or certification of any other federal or state agency.

9. The Corps of Engineers issued permit TXR3001311 pursuant to Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 403) and Section 404 of the Clean Water Act (33 U.S.C. § 1344).

10. Section 10 and Section 404 requirements are implemented by regulations set forth in Parts 320 through 330 of Title 33, Code of Federal Regulations (C.F.R.). Procedures for processing applications for such permits are set forth in these regulations.

11. The District Engineer is required by the regulations (33 C.F.R. § 325.2(a)(4) to comply with the Corps' National Environmental Policy Act (NEPA) implementation policy and guidance in 33 C.F.R. Part 230.

12. Appendix B to Part 230 specifically mandates procedures for implementing NEPA and Council on Environmental Quality (CEQ) regulations (40 C.F.R. Parts 1500 through 1508) as regards the Corps' permit program.

13. Appendix B provides for preparation of either an Environmental Assessment (EA) and Finding of No Significant Impact (FONSI) or an Environmental Impact Statement (EIS), where appropriate, in cases of permit applications not deemed by the District Engineer to qualify for "categorical exclusion."

14. Appendix B, paragraph 1, provides, that, "[b]ecause of the diverse geographic areas and types of activities covered by this regulation, it is likely that interpretive problems may arise from time to time. In keeping with Executive Order 12044 and the policy stated in the CEQ regulation implementing NEPA (40 C.F.R. 1500.2), where interpretive problems arise and consideration of all other factors do not give a clear indication of a reasonable interpreta-

tion, the interpretation (consistent with the spirit and intent of NEPA) which results in the least paperwork and delay will be used."

15. Appendix B, paragraph 8.c., provides, in part, that "[t]he FONSI will be based on information contained in the EA and other pertinent data obtained from co-operating federal agencies having jurisdiction by law or special expertise, the interested public, the applicant, and the Corps' expertise."

16. 33 C.F.R. § 320.4(a) requires, in part, that a permit will be granted unless the district engineer determines that it would be contrary to the public interest.

17. 33 C.F.R. § 320.4(c) requires that, "[i]n accordance with the Fish and Wildlife Coordination Act (paragraph 320.3(e)), district engineers will consult with the Regional Director, U.S. Fish and Wildlife Service, the Regional Director, National Marine Fisheries Service, and the head of the agency responsible for fish and wildlife for the state in which work is to be performed, with a view to the conservation of wildlife resources by prevention of their direct and indirect loss and damage due to the activity proposed in a permit application. The Army will give full consideration to the views of those agencies on fish and wildlife matters in deciding on the issuance, denial, or conditioning of individual or general permits."

18. 33 C.F.R. § 320.4(d) provides, in part, that "[c]ertification of compliance with applicable effluent limitations and water quality standards required under provisions of Section 401 of the Clean Water Act will be considered conclusive with respect to water quality considerations unless the Regional Administrator, Environmental Protection Agency (EPA), advises of other water quality aspects to be taken into consideration." Plaintiffs did not challenge the granting of the Texas water quality certification in any of the administrative proceedings and are foreclosed from raising it with this court. *Friends of the Earth v. Hintz*, 800 F.2d 822, 834 (9th Cir.1986).

19. 33 C.F.R. § 320.4(m), *Water Supply and Conservation*, provides, in part, "that actions affecting water quantities are subject to the Congressional policy as stated in section 101(g) of the Clean Water Act which provides that the authority of states to allocate water quantities shall not be superseded, abrogated or otherwise impaired."

20. 33 C.F.R. § 325.4(a) provides that "[d]istrict engineers will add special conditions to Department of the Army permits when such conditions are necessary to satisfy legal requirements or to otherwise satisfy the public interest requirement. Permit conditions will be directly related to the impacts of the proposal, appropriate to the scope and degree of those impacts, and reasonably enforceable."

21. 33 C.F.R. § 320.4(r)(1) provides that special conditions may mitigate to avoid, minimize, rectify, reduce or compensate for resource losses.

STANDARD OF REVIEW

22. When reviewing the decision of a government agency to not prepare an EIS, the role of the reviewing court shall not "interject itself within the area of discretion ... as to the choice of the action to be taken." *Strycker's Bay Neighborhood Council Inc. v. Karlen*, 444 U.S. 223, 227–28, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980), *quoting in part, Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). "[O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences." *Strycker's, supra.*

23. The United States Supreme Court has limited judicial review of agency decisions made pursuant to NEPA. *See, e.g., Strycker's Bay Neighborhood Council, Inc. v. Karlen, supra*, 444 U.S. at 226–28, 100 S.Ct. at 499–500; *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.*, 435 U.S. 519, 555, 98 S.Ct. 1197, 1217, 55 L.Ed.2d 460 (1978); *Kleppe v. Sierra Club, supra*, 427 U.S. at 412, 96 S.Ct. at 2731. In *Vermont Yankee*, the Court stated:

"We have also made it clear that the role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one, limited both by the time at which the decision was made and by the statute mandating review.

'Neither the statute nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions.' "

*Vermont Yankee, supra,* 435 U.S. at 555, 98 S.Ct. at 1217, *quoting in part, Kleppe v. Sierra Club, supra,* 427 U.S. at 410, n. 21, 96 S.Ct. at 2730, n. 21. *See, Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). It is the Court's role to determine whether the agency has in fact adequately studied the issue and taken a "hard look" at the environmental consequences of its decision. *Kleppe v. Sierra Club, supra,* 427 U.S. 390, 410, n. 21, 96 S.Ct. 2718, 2730, n. 21, 49 L.Ed.2d 576 (1976).

24. Judicial review of an agency's compliance with NEPA is narrowly circumscribed:

"NEPA, while establishing 'significant substantive goals for the Nation,' imposes upon agencies duties that are 'essentially procedural.' ... [O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.' "

*Strycker's Bay Neighborhood Council Inc. v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980) (citations omitted).

25. The appropriate standard of review, adopted by the Tenth Circuit in *Wyoming Outdoor Coordinating Council v. Butz,* 484 F.2d 1244 (10th Cir.1973), is for the reviewing court to determine whether the negative determination by the agency was "reasonable." "We are convinced that the compass of the judgment to be made is narrow and that the determination must be reasonable in the light of the mandatory requirements and high standards set by the [NEPA] statute." Id. at 1249. *See also, League of Women Voters of Tulsa, Inc. v. United States Corps of Engineers,* 730 F.2d 579, 583 (10th Cir.1984); *Environmental Defense Fund, Inc. v. Andrus,* 619 F.2d 1368, 1376 (10th Cir.1980); *Jette v. Bergland,* 579 F.2d 59 (10th Cir.1978); *National Helium Corp. v. Morton,* 486 F.2d 995, 1001 (10th Cir.1973), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974).

26. According to previous pronouncements of the Court of Appeals of the Tenth Circuit, the agency's determination is reasonable if the agency made a "good faith, objective effort" to comply with NEPA's procedural requirement. *See, e.g., Jette, supra,* 579 F.2d at 63–64; *National Helium Corp., supra,* 486 F.2d at 1001 ("The better reasoned decisions have required an objective good faith effort to comply with the statutory procedural requirements."); *Environmental Defense Fund, supra,* 619 F.2d at 1368; *Manygoats v. Kleppe,* 558 F.2d 556, 560 (10th Cir.1977).

27. In *Jette v. Bergland,* 579 F.2d 59 (10th Cir.1978), the court remanded the case to the trial court for a factual determination of whether an EIS was required. Again, the court's analysis emphasized the adequacy of the agency procedure and its compliance with the requirements of NEPA. *Id.* at 63–64.

28. In *Environmental Defense Fund, Inc. v. Andrus,* 619 F.2d 1368 (10th Cir. 1980), the court considered the decision of the Secretary of the Interior to approve an oil shale leasing program without preparing a supplemental EIS. It held that the agency need not make an exhaustive review of every conceivable or contingent environmental consequence but rather, needs to reasonably address the "readily ascertained" effects of the proposal:

"The discussion of environmental effects of all alternatives need not be exhaustive, but it must be such that sufficient information is contained therein to permit a 'rule of reason' designation of alternatives beyond the primary propos-

al.... If the environmental aspects of proposed actions are easily indentifiable, they should be related in such detail that the consequences of the action are apparent. If, however, the effects cannot be readily ascertained and if the alternatives are deemed remote and only speculative possibilities, detailed discussion of environmental effects is not contemplated under NEPA.

\*　　\*　　\*　　\*　　\*　　\*

Furthermore, the requirement in NEPA of discussion as to reasonable alternatives does not require 'crystal ball' inquiry ... The statute must be construed in the light of reason if it is not to demand what is, fairly speaking, not meaningfully possible...."

*Id.* at 1375. The *Andrus* court also noted that special monitoring provisions, similar to the conditions attached to the permit in the case at bar, were added to the leasing program in order to protect against potential environmental impacts not previously identified. Therefore, the court held that the preparation of a supplement EIS was not required. *Id.* at 1382.

30. Deference is given to an agency's interpretation of the statutes, rules, and regulations which it administers. *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); and *Ethyl Corp. v. EPA,* 541 F.2d 1, 34–36 (D.C.Cir.) (*en banc*), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976).

31. Pursuant to the Court's order of October 14, 1987, the Court authorized the parties to each introduce limited oral testimony relative to the scope and impact of the environmental and ecological issues. Such was permitted because the Court concluded the environmental and ecological issues were sufficiently complex that an adversary evidentiary approach was necessary to determine if there were significant oversights by the Corps in its investigation and assessment revealed by the Administrative Record. The Court concluded that it could not rely solely on the Administrative Record for this determination. *Sierra Club v. Stamm,* 507 F.2d 788 (10th Cir. 1974); *County of Suffolk v. Secretary of Interior,* 562 F.2d 1368 (2d Cir.1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978); *ASARCO, Inc. v. U.S. E.P.A.,* 616 F.2d 1153 (9th Cir.1980); *NO OILPORT! v. Carter,* 520 F.Supp. 334 (W.D.Wash.1981); *National Helium Corp. v. Morton,* 361 F.Supp. 78 (D.Kan.1973), *rev'd on other grounds,* 486 F.2d 995 (1973); *National Indian Youth Council v. Andrus (Indian Youth Council I),* 501 F.Supp. 649 (D.N.M.1980); *Hiatt Grain & Feed, Inc. v. Bergland,* 446 F.Supp. 457 (D.Kan.1978).

## MITIGATING SPECIAL CONDITIONS

■ 32. Plaintiffs contend that the Corps' issuance of a FONSI in conjunction with mitigating conditions was improper and only served as a "postponement" of the Corps' responsibility to consider environmental consequences. Numerous federal Court of Appeals decisions, however, including those in the Tenth Circuit, have approved the use of mitigated FONSIs. *See, e.g., Park County Resource Council, Inc. v. United States Dept. of Agriculture,* 817 F.2d 609 (10th Cir.1987); *See, Environmental Defense Fund, Inc. v. Andrus,* 619 F.2d 1368, 1376 (10th Cir.1980); *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976 (9th Cir.1985); *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson,* 685 F.2d 678 (D.C.Cir.1982); *Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851 (9th Cir.1982); *Friends of the Earth v. Hintz,* 800 F.2d 822, 836–38 (9th Cir.1986). "[I]n deciding whether the agency's decision was reasonable, we must consider such mitigating measures ... imposed in this case so as to avoid untoward environmental consequences." *Park County, supra,* 817 F.2d at 621. In *Environmental Defense Fund, supra,* 619 F.2d at 1373, the court found similar environmental protection measures "quite significant and compelling in relation to compliance with the mandates of NEPA." Appropriate mitigating conditions have eliminated the need for an EIS under the circumstances of this case.

**1490**

CUMULATIVE IMPACT

33. Plaintiffs assert the Corps of Engineers acted improperly by failing to require a "cumulative impact" EIS. In CEQ regulations, a "cumulative impact" is defined as:

> "[T]he impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."

40 C.F.R. § 1508.7 (1985).

The United States Supreme Court has stated that the mere possibility of future action is insufficient to require an EIS. "[A]n EIS need not be prepared simply because a project is contemplated, but only when the project is proposed." *Weinberger v. Catholic Action*, 454 U.S. 139, 146, 102 S.Ct. 197, 203, 70 L.Ed.2d 298 (1981).

34. The Court of Appeals of the Tenth Circuit has also addressed the issue of when a cumulative impact EIS is required. In *Park County Resource Council, Inc. v. United States Dept. of Agriculture*, 817 F.2d 609, 623 (10th Cir.1987), the court stated that in order to require a cumulative impact EIS, the present action and the possible future actions must be "so interdependent that it would be unwise or irrational to complete one without the others." *Id.* at 623, *quoting, Webb v. Gorsuch*, 699 F.2d 157, 161 (4th Cir.1983). *See also, Sierra Club v. Froehlke*, 534 F.2d 1289, 1297–99 (8th Cir.1976); *Trout Unlimited v. Morton*, 509 F.2d 1276, 1285 (9th Cir.1974).

*THIRTY–DAY REVIEW—(40 C.F.R. § 1501.4(e)(2)*

35. Plaintiffs urge that the Corps was required to make its FONSI available for public review for thirty days before issuing its final determination as to whether to require an EIS, pursuant to 40 C.F.R. § 1501.4(e)(2). On this basis, Plaintiffs ask that the project be enjoined. (Plaintiffs' Conclusions of Law, p. 35.) The regulation Plaintiffs cite, however, is only applicable if the proposed transfer of water is "unprecedented." Plaintiffs have acknowledged that a similar diversion of water from the Red River to the Trinity River system took place between 1954 and 1957.[4] (Plaintiffs' Conclusions of Law, p. 37.) Furthermore, Plaintiffs have not denied the considerable evidence at trial that interbasin transfers of water in Texas and other states are common and that an additional interbasin transfer between Cooper Lake (in the Red River basin) and Lake Lavon (in the Trinity River basin) has already been permitted. Since the proposed project was not unprecedented, a thirty-day review period was not required.

36. Even if this Court should find that the Corps should have waited thirty days before issuing its final determination, Plaintiffs cannot show that they have suffered irreparable harm or that the balance of equities is in their favor so as to entitle them to injunctive relief. At best, Plaintiffs might be entitled to an additional thirty-day review period during which the Corps would receive additional comments. In fact, however, well over thirty days have passed since the issuance of the FONSI and the Corps has not altered its judgment. Plaintiffs cannot in good faith allege that if the Corps now took an additional thirty days, it would be likely to withdraw the permit. To the contrary, the Corps has continually reiterated throughout the trial and at the conclusion of the trial in the testimony of Colonel Patete that the issuance of the permit with mitigating conditions and the associated FONSI was and is the proper action. Since Plaintiffs have suffered no harm as a result of the Corps' failure to delay thirty days and would obtain no benefit from the receipt of an additional thirty days, Plaintiffs are not enti-

---

4. Plaintiffs have alleged that the 1954–57 transfer of water "was not without great difficulties." (Plaintiffs' Conclusions of Law, p. 37.) Plaintiffs, however, both in their brief and at trial provided neither support for this assertion nor any explanation of what these alleged "difficulties" may have been, other than perhaps some plumbing pipe corrosion.

tled to injunctive relief. *Realty Income Trust v. Eckerd,* 564 F.2d 447 (D.C.Cir. 1977); *see, e.g., American Motorcyclist Ass'n v. Watt,* 714 F.2d 962 (9th Cir.1983); *Alpine Lakes Protection Society v. Schlapfer,* 518 F.2d 1089, 1090 (9th Cir. 1975).

## ALTERNATIVES—CONSERVATION

37. The Plaintiffs assert that the Corps failed to consider alternatives to the proposed project, as required by NEPA. The several draft Environmental Assessments contained in the Administrative Record demonstrate that the Corps considered numerous alternate locations from which the District and GTUA could conceivably obtain additional municipal and/or industrial water. Further, the Administrative Record also reflects that the Corps did not believe that water conservation was a realistic alternative to supplying the established expanding needs for water of the growing population in the District's service area. Moreover, none of the Plaintiffs advanced conservation as an alternative during the environmental review process. Delayed and obscure assertions of environmental claims was condemned by the United States Supreme Court in the case of *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), in which the Court stated:

> "[A]dministrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated...."

*Id.* at 553–54, 98 S.Ct. at 1216–17.

38. In conclusion, the Administrative Record demonstrates that the Corps of Engineers considered each potential environmental problem that came to its attention. The Corps complied with federal regulations requiring the mailing of public notices and a public notice and comment period. The Corps twice extended the public comment period to insure that all parties could be heard. Additionally, the Corps of Engineers held meetings with individual groups and hearings with the general public in order to receive reasonable and necessary input from all concerned parties. The Corps requested additional studies on all potential environmental problems and required the addition of mitigating conditions to the permit. In further compliance with NEPA, based on the information before it, the Corps made a Finding of No Significant Impact (FONSI) regarding the permit application. Since the Corps found no significant impact, the Corps was not required to produce an Environmental Impact Statement (EIS), as its Environmental Assessment (EA) was adequate and complied with law.

39. The Defendants, United States Army Corps of Engineers, John Marsh, Jr., as Secretary of the Army of the United States, E.R. Heiberg, III, as Chief of Engineers, U.S. Army Corps of Engineers, Tulsa District, Frank M. Patete, as Tulsa District Engineers, and Intervenors, North Texas Municipal Water District and Greater Texoma Utility Authority, are entitled to judgment in their favor herein.

A separate Judgment will be entered in conformity with these Findings of Fact and Conclusions of Law this date.

## JUDGMENT

In keeping with the Findings of Fact and Conclusions of Law entered this date, Judgment is hereby entered in favor of the Defendants, United States Army Corps of Engineers, John Marsh, Jr., as Secretary of the Army of the United States, E.R. Heiberg, III, as Chief of Engineers, U.S. Army Corps of Engineers, Tulsa District, Frank M. Patete, as Tulsa District Engineer, and Intervenors, North Texas Municipal Water District and Greater Texoma Utility Authority, and against the Plaintiff, Oklahoma Wildlife Federation, a non-profit organization, and State of Oklahoma, Sportsmen's Clubs of Texas, Inc., and Prairie and Timbers Audubon Society, Intervenors. The Court determines herein and declares that the United States Army Corps of Engi-

neers did not violate the National Environmental Policy Act in granting Permit No. TXR3001311; and further the injunction prayed for herein by Plaintiffs and Intervenors directing the United States Army Corps of Engineers to revoke or suspend issuance of said permit until and unless an Environmental Impact Statement on the project is completed is denied. Costs are hereby assessed against the nonprevailing Plaintiff and Intervenors and each party herein is to pay their own respective attorneys' fees.